**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **VALOR TECHNICAL CLEANING, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.:  5:26-cv-1473 |
| | § | |
| **ANDREW VICK, TRUCARE BIOCLEAN** | § | **JURY TRIAL DEMANDED** |
| **LLC, COLTON VICK, GARRETT VICK,** | § | |
| **AND BRIAN HEGERT,** | § | |
| | § | |
| Defendants. | § | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Valor Technical Cleaning, LLC ("Valor" or the "Company") brings this Complaint against Defendants Andrew Vick, TruCare BioClean LLC ("TruCare"), Colton Vick, Garrett Vick, and Brian Hegert ("Hegert") (collectively, the "Defendants") and alleges as follows:

**INTRODUCTION**

1.      This case arises from a brazen scheme orchestrated by Defendants to steal Valor's trade secrets, exploit its confidential and proprietary business information, and prey upon grieving families at their most vulnerable moments.  Defendants' misconduct warrants substantial damages and immediate injunctive relief.

2.      Valor is a professional crime scene and biohazard cleanup service that provides its cleanup services nationwide.  When tragedy strikes—a violent death, a traumatic accident, or a crime scene—Valor's highly trained technicians arrive to decontaminate and restore the affected property to its pre-incident condition.  These cleanups are often complex and can require days or even weeks of highly skilled, specialized work.  Valor's clients are frequently in crisis, trusting

Valor to provide compassionate, professional service. Due to the specialized nature of this work, each job can cost thousands of dollars, or in some cases, tens of thousands of dollars.

3. Defendants have weaponized that trust to steal Valor's business in a scheme that is as calculating as it is reprehensible. In a coordinated conspiracy, former Valor employees provided one of Valor's competitors with real-time access to Valor's confidential customer relationship management system, a system that contains information regarding active jobs and maintains Valor's referral network. Using Valor's stolen trade secrets and confidential information, Defendants intercepted sales leads and active customer jobs, impersonated Valor personnel, diverted Valor technicians away from Valor job sites, and improperly induced customers to sign contracts with TruCare—a competing company formed during Andrew Vick's employment with Valor by brothers Colton and Garrett Vick.

4. Defendants' scheme has now been discovered. On February 12, 2026, a trusted Valor referral source called Valor to request cleanup services following a family member's death at a property in Bandera, Texas (the "Bandera Job"). Within minutes of Valor logging the job in its customer relationship management platform, someone using stolen login credentials accessed Valor's system from Kerrville, Texas, where TruCare is headquartered. Armed with the confidential details of the Bandera Job, Defendants sprang into action: one co-conspirator called the customer and informed her that the assigned Valor technician had been diverted to a "murder scene." Another co-conspirator, posing as a friend of the customer, called the actual Valor technician en route to the job and told him the appointment needed to be rescheduled. With the legitimate Valor technician out of the way, a TruCare technician arrived at the property and induced the grieving customer to sign a TruCare contract for the services she called Valor to perform and never requested from TruCare.

5.      This is but one example; the Defendants' conduct is not limited to a single stolen job. Evidence demonstrates that Andrew Vick, while still employed by Valor, was systematically funneling business opportunities to TruCare for months—logging sales leads and jobs as "lost-no insurance" in Valor's system when, upon information and belief, he was actually directing customers to TruCare. Indeed, TruCare's business model appears to be built on stealing and using Valor's trade secrets and confidential customer data. Following his termination from Valor on January 5, 2026, Andrew Vick wrongfully retained his Valor-issued laptop in violation of Valor's policy—leaving Valor's property in Defendants' hands and enabling continued misappropriation—and, upon information and belief, also wrongfully accessed Valor's confidential customer relationship management system.

6.      Valor brings this action to halt Defendants' unlawful conduct, recover its stolen property and confidential information, and obtain damages for the harm Defendants have caused. More pressing, Valor also seeks immediate injunctive relief to prevent further irreparable injury while this action proceeds.

## THE PARTIES

7.      Plaintiff Valor Technical Cleaning, LLC is a Colorado limited liability company with its headquarters in Centennial, Colorado. Valor is registered to do business in Texas and regularly provides services to customers within the State of Texas.

8.      Defendant Andrew Vick is an adult individual who, upon information and belief, resides in or around Kerrville, Texas. Andrew Vick was a Director of Field Operations at Valor from on or about May 22, 2025 to January 5, 2026, when Valor terminated his employment.

9.      Defendant TruCare BioClean LLC, formerly known as Lone Star BioClean Solutions LLC, is a Texas limited liability company incorporated in October 2025 with the Texas Secretary of State with its headquarters in Kerrville, Texas.

10.    Defendant Colton Vick is an adult individual who, upon information and belief, resides in San Antonio, Texas.  According to Texas Secretary of State records for TruCare, Colton Vick is the registered manager and registered agent of TruCare.

11.    Defendant Garrett Vick is an adult individual who, upon information and belief, resides in Roanoke, Texas.  According to Garrett Vick's LinkedIn profile, Garrett Vick has been a Managing Member of TruCare since October 2025.

12.    Defendant Brian Hegert is an adult individual who, upon information and belief, resides in Colorado Springs, Colorado.  Hegert was a Director of Field Operations at Valor from on or about September 22, 2025 to February 13, 2026, when he voluntarily resigned.

**JURISDICTION AND VENUE**

13.    This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, and Counts III–V, claims under Computer Fraud and Abuse Act, 18 U.S.C. §§ 1830 *et seq.  See* 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other counts in this Complaint because they form part of the same case or controversy as Counts I and III–V.  *See* 28 U.S.C. § 1367.

14.    Under 28 U.S.C. § 1391(b)(1), venue is proper in the Western District of Texas because upon information and belief, Defendants Andrew Vick and Colton Vick reside in the Western District of Texas, and TruCare is headquartered in the Western District of Texas.  Venue is also proper in the Western District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.  *See also* 28 U.S.C. § 1391(b)(3).

15.    Defendant Andrew Vick is subject to personal jurisdiction in Texas because, upon information and belief, he resides and works in Texas, maintains continuous contacts in Texas, engaged in suit-related conduct in Texas, and otherwise purposely avails himself of Texas.

16.     Defendant TruCare is subject to personal jurisdiction in Texas given its formation in Texas, maintenance of headquarters in Texas, and given that it engaged in suit-related conduct in Texas.

17.     Defendant Colton Vick is subject to personal jurisdiction in Texas because, upon information and belief, he resides and works in Texas, maintains continuous contacts in Texas, engaged in suit-related conduct in Texas, and otherwise purposely avails himself of Texas.

18.     Defendant Garrett Vick is subject to personal jurisdiction in Texas because, upon information and belief, he resides and works in Texas, maintains continuous contacts in Texas, engaged in suit-related conduct in Texas, and otherwise purposely avails himself of Texas.

19.     Defendant Hegert is subject to personal jurisdiction in Texas because, upon information and belief, he engaged in suit-related conduct directed towards Texas.

## FACTUAL ALLEGATIONS

**A.     Valor's Business and Its Valuable Trade Secrets and Confidential Information**

20.     Valor is a professional crime scene and biohazard cleanup service that provides its cleanup services nationwide.  (Exhibit 1, Declaration of Ben Pitts (hereinafter "Pitts Decl.") ¶ 3.) Valor's Amdecon-certified, OSHA-compliant team of technicians operates with military-like precision, delivering compassionate service with unmatched attention to safety and detail.  (*Id.*)

21.     Valor's business depends on a sophisticated and carefully cultivated referral network.  (*Id.* ¶ 4.) Over many years, and at significant expense, Valor has developed relationships with funeral homes, victim advocates, and other professionals across the country who refer families and individuals to Valor when crime scene and biohazard cleanup services are necessary. (*Id.*)  This referral network represents one of Valor's most valuable competitive assets.  (*Id.*)

22.     Valor's customers are often facing the aftermath of violent deaths, suicides, traumatic accidents, and crime scenes—vulnerable individuals who place their trust in Valor to

provide technical expertise and compassionate service. (*Id.* ¶ 5.) These customers call Valor from all over the country, and request that Valor perform these services across the lower 48 states. (*Id.*)

23.    When a customer contacts Valor needing crime scene and biohazard cleanup services, the call is tracked through CallRail, a confidential call tracking and analytics platform that tracks incoming call data for Valor representatives, who then learn about the needed services. (*Id.* ¶ 6.)    The Valor representative logs the customer's address and any other applicable information in the Valor customer relationship management ("CRM") system, Salesforce. (*Id.*) CallRail is integrated with Valor's Salesforce platform, which seamlessly allows Valor to combine call data and customer information to track new leads. (*Id.*) After assessing the lead and reviewing the available and nearby cleanup technicians, Valor dispatches a technician to the customer's location. (*Id.*)

24.    If an individual or entity contacts Valor regarding its services, is a candidate for Valor's services, and establishes an appointment for services, Valor considers this individual or entity a prospective customer and prepares accordingly, including by sending a technician to the location, preparing and executing a letter of engagement, and otherwise taking steps to formalize the customer relationship. (*Id.* ¶ 7.)

25.    Valor maintains technicians throughout the country and provides crime scene and biohazard cleaning services across the lower 48 states, including in Texas. (*Id.* ¶ 8.) Because technicians are not located in every city, Valor will, if necessary, send technicians on travel assignments to complete jobs if there is not a nearby available technician. (*Id.*)

26.    Before beginning services and after reviewing the site, Valor requests that the customer sign an engagement letter, covering the terms of the services. (*Id.* ¶ 9.)

27.     Valor's services are often covered by the customer's insurance.  (*Id.* ¶ 10.) Sometimes, upon learning that the insurance policy does not cover the Valor cleanup services, or deciding not to use their homeowners insurance policy for the cleanup services, a prospective customer may cancel the job, as the cost of services is too high without insurance—upwards of thousands of dollars out-of-pocket.  (*Id.*)  Even if a prospective customer cancels their intended job due to insurance purposes, Valor still considers this a prospective customer and business relationship to monitor in Salesforce, because the situation could later change, including upon further discussions with insurance, or the prospective customer's decision to pay for the services out-of-pocket.  (*Id.*)

28.     Valor's Salesforce platform tracks a customer or prospective customer's complete history with Valor, including whether jobs are canceled by customers, disqualified for insurance purposes, or lost for other reasons.  (*Id.*)

29.     Valor relies on its employees—including its Directors of Field Operations—to accurately report lost jobs in Salesforce, and the reason for that loss.  (*Id.* ¶ 11.)  An employee willing to subvert this reporting requirement could, however, theoretically falsely report a lead or job as "lost" due to no insurance—which could be a lack of insurance coverage or that a customer refused to use their homeowners insurance policy—while secretly directing a competing company to that customer to complete the work—all without drawing scrutiny from Valor management. (*Id.*)

**B.     Valor's Measures to Protect Its Trade Secrets and Confidential Information**

30.     Valor has implemented extensive measures to safeguard and secure its trade secrets, and confidential and proprietary information.  (*Id.* ¶ 12.)  These measures reflect the substantial independent economic value Valor derives from maintaining the confidentiality of its business information.  (*Id.*)  A competitor with access to Valor's trade secrets, and confidential and

proprietary information could contact Valor's sales leads, customers, or prospective customers. (*Id.*)

31.    Valor utilizes CallRail and Salesforce to track inbound calls from individuals and entities throughout the United States, referrals from referral sources, jobs, and customer data of customers and prospective customers throughout the country.  (*Id.* ¶ 13.)  Valor licenses its Salesforce platform from Salesforce and has the ability to use, control, and restrict access to its license of Salesforce.  (*Id.*)  Access to Valor's Salesforce platform is restricted to authorized users who are issued unique login credentials.  (*Id.*)  The platform is password-protected and requires multi-factor authentication, meaning that only authorized users can access Salesforce and the data contained therein.  (*Id.*)

32.    Valor employees, including Andrew Vick and Hegert during their respective employments with Valor, access Salesforce using several layers of authentication, including a username, password, and multi-factor authentication.  (*Id.* ¶ 14.)  Multi-factor authentication requires the user to confirm their identity through a second verification method—such as an authentication app—before access is granted, ensuring that only the authorized employee can log in.  (*Id.*)  Valor employees across the country utilize their respective login credentials to access Valor's Salesforce platform and to communicate with customers or prospective customers across the country.  (*Id.*)  Valor employees are not permitted to send, share, or distribute their respective Salesforce login credentials with anyone else inside or outside the Company.  (*Id.*)

33.    Valor employees are permitted to use the Valor Salesforce platform only for Valor-related business purposes.  (*Id.*)  Valor employees are not permitted to send, share, distribute, or otherwise disseminate, information contained in Valor's Salesforce platform to third parties, including former employees.  (*Id.*)

34.    After an employee is terminated, their Salesforce account is deactivated, and the former employee loses login credentials to access the Valor Salesforce platform.  (*Id.* ¶ 14.)

35.    Valor's Employee Handbook requires the return of all Company property prior to or at the time of an employee's separation to ensure that Valor's property, confidential information, and trade secrets are protected following a separation.  (*Id.* ¶ 15.)  Valor property includes, but is not limited to: (a) cell phones, iPhones, tablets, or other Valor-issued handheld devices; (b) laptops, desktop computers, files, computer files, disks, or data; and (c) access badges.  (*Id.*)  Valor employees are permitted to use Valor-issued devices only for Valor-related business purposes.  (*Id.*)

36.    Employees sign a handbook acknowledgement at or near the start of their employment with Valor, acknowledging that they have read the Employee Handbook and agree that it is their responsibility to "comply with the policies contained in" it.  (*Id.*)

37.    Valor employees are onboarded with the understanding that the information contained in Salesforce is confidential.  (*Id.* ¶ 19.)

38.    Valor's Employee Handbook covers the Company's confidentiality expectations.  (*Id.* ¶ 16.)  The Employee Handbook provides:

> Our company has an excellent reputation for conducting its business activities with honesty, fairness, and in accordance with the highest ethical standards.  As an employee, you enjoy the benefits of that reputation and are obligated to uphold it.
>
> Information is an asset of the Company and, as such, steps will be taken to protect it from unauthorized access, modification, reproduction, destruction or disclosure (written, verbal or electronic transmittal), whether accidental or intentional.  This includes, but is not limited to, any information processed by hand, personal computer, laptop or other electronic devices utilized in the Company's operations, and maintained in hard copy files, storage or electronic devices and services.

Protecting our company's and customer information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not discuss the Company's confidential business or information or any customer information with any unauthorized persons or any person outside of the Company and make every effort to keep such information secure and confidential.

As trusted employees of our company, you acknowledge that customer and client lists, customer information, documents, business data, and proprietary information are valuable assets of our Company. You agree that you will not, at any time, for any reason, disclose or use any of our confidential information, trade secrets, customer lists, customer information, etc. unless specifically authorized to do so, and you further agree not to discuss or disclose such information to anyone outside of our Company. Violations of this policy will result in severe disciplinary action and/or legal action. This confidentiality requirement applies to all current employees as well as to all employees for a two (2) year period following the termination of their employment. In the case of trade secrets, former employees may not misappropriate, use, or divulge the trade secrets indefinitely following their termination of employment.

(*Id.*) Importantly, the Employee Handbook provides that employees may not "at any time, for any reason, disclose or use any of our confidential information, trade secrets, customer lists, customer information, etc. unless specifically authorized to do so, and you further agree not to discuss or disclose such information to anyone outside of our Company." (*Id.* ¶ 17.)

39.     Valor also requires its employees to sign a Confidentiality Agreement at the outset of their employment. (*Id.* ¶ 18.) It is contained in each employee's offer letter. (*Id.*) By signing this agreement, each employee agrees to hold any and all Valor confidential information and trade secrets in trust and confidence for Valor's sole and exclusive use and benefit. (*Id.*)

40.     On May 7, 2025, Andrew Vick signed his Confidentiality Agreement. (*Id.* ¶ 20.) The agreement was supported by consideration because, among other things, agreeing to its terms was a condition of Andrew Vick's employment. (*Id.*) Moreover, Valor in fact provided Andrew

Vick with confidential and proprietary information during his employment with Valor in exchange for his acceptance of the terms of the Confidentiality Agreement. (*Id.*)

41.    On September 17, 2025, Hegert signed his Confidentiality Agreement. (*Id.* ¶ 21.) As with Vick, the agreement was supported by consideration because, among other things, agreeing to its terms was a condition of Hegert's employment. (*Id.*) Moreover, Valor in fact provided Hegert with confidential and proprietary information in exchange for his acceptance of the terms of the Confidentiality Agreement. (*Id.*)

42.    The Confidentiality Agreement required Andrew Vick and Hegert to hold Valor confidential and proprietary information in "trust and confidence for Valor's sole and exclusive use and benefit." (*Id.* ¶ 22.) Specifically, pursuant to the Confidentiality Agreement, Andrew Vick and Hegert respectively agreed as follows:

> In the course of your employment with Valor, you will come into possession of confidential and proprietary information regarding Valor's business activities. You acknowledge that all such information belongs to Valor, constitutes specialized and highly confidential information not generally known in the industry; and in some instances, constitutes trade secrets of Valor. Accordingly, you recognize and acknowledge that it is essential to Valor to protect Valor's confidential and proprietary information, and you will hold such information in trust and confidence for Valor's sole and exclusive use and benefit.

(*Id.*)

43.    Valor utilizes different agreements to protect its Confidential Information. (*Id.* ¶ 23.) For example, in the Confidentiality Agreement, the information defined as confidential includes Valor's business activities broadly. (*Id.*) Further, in its restrictive covenant agreements, Confidential Information is defined to include, but not limited to,

> (i) information concerning the business or affairs of the Related Companies, however documented, whether or not such information is considered a "trade secret" under either common law or any applicable statute, including, but not limited to, historical financial

statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training techniques and materials, product or service specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing, marketing or distribution methods and processes, customer lists, prospective customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures and architectures (and related formulae, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a "trade secret" either under common law or as such term is defined by statute under the laws of any applicable jurisdiction; and (ii) notes, analysis, compilations, studies, summaries and other materials prepared by or for any Related Companies, containing or based, in whole or in part, on any information included in the foregoing. Notwithstanding the foregoing, "Confidential Information" will not include any of the foregoing that (x) is or becomes generally available to the public other than as a result of your breach of this Restrictive Covenants Addendum, or (y) is or becomes available to you on a non-confidential basis from a source, other than the Related Companies, that, to your knowledge, after reasonable inquiry, was not at the time of disclosure under a confidentiality obligation with respect to such information. You acknowledge and agree that the Confidential Information is treated by the Related Companies as confidential and derives independent value from not being generally known to and not readily ascertainable by proper means by other persons.

(*Id.*) For ease of reference, "Confidential Information" as used herein refers collectively to information falling within the definitions used in the Confidentiality Agreement and restrictive covenant agreements.

44.     Both Andrew Vick and Hegert agreed to non-compete agreements as a part of Valor's incentive bonus program, the Equity Appreciation Plan. (*Id.* ¶ 24.) As a condition of that program, Andrew Vick and Hegert respectively agreed to the Restrictive Covenants Addendum ("Restrictive Covenant Agreement") to the Participant's Award Agreement, prohibiting each from

working for certain competitors or soliciting certain clients and employees during and after his employment with Valor. (*Id.*)

45.    The Restrictive Covenant Agreement recognizes that Andrew Vick and Hegert would have or will have access to trade secrets and Confidential Information of Valor, "which, if disclosed, would unfairly and inappropriately assist in competition against" Valor. (*Id.*)

46.    The Restrictive Covenant Agreement further provides that Andrew Vick and Hegert each:

> shall not, directly or indirectly, during the Restricted Period and within the Restricted area, (i) solicit, divert or take away business from, or compete with, any Related Company; (ii) own, operate, control, finance, manage, advise, be employed or engaged by, or perform any services for, invest in or otherwise become associated in any capacity with (other than holding less than two percent (2%) of the outstanding equity or debt securities of such person having securities that are listed for trading on a national securities exchange or quotation system or actively traded over the counter), any business, company, partnership, organization, proprietorship or other entity that is engaged in the same or similar business as the business conducted by the Related Companies; or (iii) engage in any practice, for the purpose or effect of which is to intentionally evade the provisions of this covenant.

(*Id.* ¶ 25.)  The agreement defines "Restricted Area" as "an area within a 150-mile radius of the location where you perform services for the Company and within 150-mile radius of any location of a customer or client of any Related Company for whom you provide services." (*Id.* ¶ 26.)  There is no dispute that during his employment with Valor, Andrew Vick performed services for Valor customers within 150 miles of Kerrville, Texas.  (*Id.*) "Restricted Period" is defined in the agreement as "the period of time during your employment or service with any Related Company, plus a period of two (2) years following any termination of such employment or service."  (*Id.* ¶ 27.)  Thus, under the Restrictive Covenant Agreement, Andrew Vick and Hegert each were and are prohibited engaging in the above-identified behaviors—including working, being employed

by, or performing services for a competing entity—during their employment with Valor and for two years following their termination within the Restricted Area. (*Id.*)

47. Furthermore, Andrew Vick and Hegert, respectively, through signing the Restrictive Covenant Agreement, further agreed not to "induce or attempt to induce any . . . customer. . . to terminate or adversely change its relationship with such Related Company . . . ." (*Id.* ¶ 28.)

48. Finally, Andrew Vick and Hegert, respectively, through signing the Restrictive Covenant Agreement, acknowledged that "[i]n the course of your employment by a competitor, you would inevitably use or disclose such trade secrets and Confidential Information," which they obtained through their employment relationship with Valor. (*Id.* ¶ 29.) The Restrictive Covenant Agreement permits Valor to seek specific performance and/or injunctive relief, without posting a bond or other security, in the event of a breach or threatened breach of the agreement because "money damages would be an inadequate remedy for any breach." (*Id.* ¶ 30.)

49. Valor's Confidential Information and trade secrets are some of Valor's most valuable assets. (*Id.* ¶ 31.) Valor has spent many years and millions of  dollars to generate customer contacts and referral sources. (*Id.*)

50. Valor has used—and will continue to use—its Confidential Information in the crime scene and biohazard cleanup service industry. (*Id.*) Because this information is confidential, Valor's competitors do not know and do not have access to such information, which provides Valor with a competitive advantage. (*Id.*)

C.     **Andrew Vick's Employment with Valor and Access to Confidential Information**

51. Valor hired Andrew Vick as a Director of Field Operations on or about May 22, 2025. (*Id.* ¶ 32.) In his role, Andrew Vick helped manage the Valor Emergency Call Center,

receiving inbound calls, dispatching technicians to jobs, and following up with clients. (*Id.* ¶ 33.) As a Director of Field Operations, Andrew Vick was a highly trusted employee. (*Id.*)

52.    In his role, Andrew Vick had access to a host of Valor's Confidential Information including, among other things, the CallRail platform and the Salesforce platform containing sales leads, client contact information, specialized training in highly technical and specific biohazard situations, product or service specifications, customer lists, prospective customer lists, current and anticipated customer job specifications, price lists, and business plans. (*Id.*)

**D.    Hegert's Employment with Valor and Access to Confidential Information**

53.    Valor hired Hegert as a Director of Field Operations on or about September 22, 2025. (*Id.* ¶ 32.) In his role, Hegert helped manage the Valor Emergency Call Center, receiving inbound calls, dispatching technicians to jobs, and following up with clients. (*Id.* ¶ 33.) As a Director of Field Operations, Hegert was a highly trusted employee. (*Id.*)

54.    In his role, Hegert had access to a whole host of Valor's Confidential Information including, among other things, the CallRail platform and the Salesforce platform containing sales leads, client contact information, specialized training in highly technical and specific biohazard situations, product or service specifications, customer lists, prospective customer lists, current and anticipated customer job specifications, price lists, and business plans. (*Id.*)

**E.    Formation of Competitor, TruCare, During Andrew Vick's Employment with Valor**

55.    While Andrew Vick was employed by Valor and bound by his confidentiality and restrictive covenant obligations, his brothers Colton Vick and Garrett Vick formed a competing company. (*Id.* ¶ 34.) On October 16, 2025, Colton Vick filed a Certificate of Formation with the Texas Secretary of State to establish Lone Star BioClean Solutions LLC ("Lone Star"). (*Id.* ¶ 35, Ex. A.) According to Garrett Vick's LinkedIn profile, Garrett Vick has been a Managing Member

of TruCare since October 2025.  (*Id.* ¶ 35.)  Upon information and belief, Andrew Vick, Colton Vick, and Garrett Vick are brothers.  (*Id.* ¶ 34.)

56.    According to the Certificate of Formation, Colton Vick was the initial registered agent for Lone Star, with an address of 2135 Green Creek St., San Antonio, TX 78232.  (*Id.* ¶ 36.)  The Certificate of Formation listed Colton Vick as a Manager of Lone Star.  (*Id.*)

57.    According to a Certificate of Amendment, Lone Star rebranded and renamed the entity to TruCare BioClean LLC on or about February 3, 2026—less than one month after Andrew Vick's termination from Valor.  (*Id.* ¶ 37, Ex. B.)

58.    The TruCare website describes the Company as "a veteran- and family-owned biohazard remediation company providing professional, discreet, and compassionate trauma scene cleanup services across Texas.  The company was founded by brothers raised in the Texas Hill Country, now living in the Dallas–Fort Worth and San Antonio area, who recognized a critical need for clear, reliable biohazard cleanup services during times of crisis."  (*Id.* ¶ 38.)  A screenshot of the "Our Story" page of the website is included below.  (*Id.*)

# Our Story

TruCare BioClean is a veteran- and family-owned biohazard remediation company providing professional, discreet, and compassionate trauma scene cleanup services across Texas. The company was founded by brothers raised in the Texas Hill Country, now living in the Dallas–Fort Worth and San Antonio area, who recognized a critical need for clear, reliable biohazard cleanup services during times of crisis.

That need became especially clear while assisting first responders during the July 2025 floods that impacted communities across Texas and resulted in significant loss of life. In those moments, families and property owners were often unsure who to call or what steps to take next once emergency response concluded. TruCare BioClean was created to fill that gap—providing guidance, rapid response, and professional cleanup when it matters most.

Our role is to help restore safety, dignity, and peace of mind after traumatic events. We approach every situation with respect, professionalism, and a commitment to doing the work the right way for the communities we serve.

59.     The TruCare website provides that TruCare was founded by brothers.  (*Id.*)

60.     The TruCare website lists the company's address as 819 Water St., Ste. 107, Kerrville, TX 78028, with a contact number of 830-282-0809.  (*Id.* ¶ 39.)  As detailed below, the unauthorized access to Valor's Salesforce platform originated from Kerrville, Texas—the same city where TruCare is headquartered.

**F.      Suspicious Decline in Valor's Texas Business During Andrew Vick's Employment**

61.     Beginning in the summer of 2025—shortly after Andrew Vick joined Valor and while TruCare's predecessor Lone Star was being organized—Valor experienced a significant and puzzling number of no-insurance lost jobs, particularly in the South and Central regions.  (*Id.* ¶ 40.)  These losses occurred when inbound referrals were not converted to successful jobs due to an alleged lack of insurance or a family's alleged refusal to use their homeowner's insurance policy. (*Id.*)  Although the geographic composition of the Regions has changed over time, Andrew Vick managed Texas throughout his employment, whether Texas was assigned the South or Central Region.  (*Id.*)  Upon information and belief, this pattern resulted in substantial lost business for Valor. (*Id.*)

62.     Critically, while there was a general decline of inbound referrals across the Company, there was a noticeable percentage of lost jobs due to an alleged lack of insurance specifically by Andrew Vick.  (*Id.* ¶ 41.)  A review of Salesforce CRM data reveals Andrew Vick's percentage of lost jobs due to an alleged lack of insurance—as logged in Salesforce—was higher than expected based on the number of jobs from July 2025 and through his termination in January 2026. (*Id.*)  Andrew Vick's no-insurance percentage rate for this period was approximately double the Company average.  (*Id.*)

63.     Given Andrew Vick's significant percentage of no-insurance lost jobs, upon information and belief, Andrew Vick may have been improperly funneling opportunities for jobs

to TruCare—formerly known as Lone Star—as early as July 2025.  (*Id.* ¶ 42.)   Valor is investigating these allegations further.

**G.    Andrew Vick's Termination and Post-Termination Misconduct**

64.    On January 5, 2026, Valor terminated Andrew Vick's employment.  (*Id.* ¶ 43.)

65.    With his termination, Andrew Vick lost access to Valor's Salesforce platform.  (*Id.*)  After his termination, information contained in Valor's Salesforce platform was no longer available to Andrew Vick using his own username and password.  (*Id.*)

66.    Following his termination on January 5, 2026, Andrew Vick retained his Valor-issued laptop in violation of his contractual obligations and despite Valor's request to return the laptop.  (*Id.* ¶ 44.)  Valor does not know the extent of Confidential Information, including trade secrets and proprietary documents, which may exist on Andrew Vick's Valor-issued laptop.  (*Id.*)  Although access to Valor's systems has been blocked on Andrew Vick's Valor-issued laptop after his termination, it is possible that Andrew Vick could have downloaded any number of proprietary documents or Confidential Information prior to his termination.  (*Id.*)  The retention of the Valor-issued laptop—and Valor Confidential Information—poses an ongoing and serious threat to Valor, as Andrew Vick could continue to access and use any proprietary documents or Confidential Information on the device.  (*Id.*)

67.    In a particularly brazen display of disregard for Valor's property rights following his termination on January 5, 2026, from January 9, 2026 to January 11, 2026, Andrew Vick rented a Mercedes GLE 350 with National Car Rental ("National") at the Dallas-Fort Worth International Airport in Dallas, Texas, using the Valor corporate National account and charging his rental to the Valor corporate card on file.  (*Id.* ¶¶ 45-46.)  At the time of his rental with National on January 9, 2026, Andrew Vick was no longer employed by Valor and had no authorization to use Valor's corporate National account.  (*Id.* ¶ 46.)

**H.      The February 12, 2026 Bandera, Texas Job: Anatomy of Defendants' Scheme**

68.      On February 12, 2026, a trusted referral source (the "Referral Source") contacted Valor to request cleanup services following a family member's tragic death in Bandera, Texas (referred to as the "Bandera Job").  (Exhibit 2, Declaration of Albert Armendariz (hereinafter "Armendariz Decl.") ¶ 2.)  On or around 2:34 p.m. Central Time ("CT") on the same day, the information was logged in to Valor's Salesforce platform by a Valor employee, identifying the caller (*i.e.*, the prospective customer), the location, and the nature of the work being requested. (Ex. 1, Pitts Decl. ¶ 47.)  Hegert and two other Valor employees were tagged on this job after this was inputted.  (*Id.*)

69.      At or around 3:28 p.m. CT, Valor technician Antwone Ortiz ("Ortiz") contacted the Referral Source, informing her that he would be at her location in approximately one hour and thirty minutes.  (Exhibit 3, Declaration of Antwone Ortiz (hereinafter "Ortiz Decl.") ¶ 4.)

70.      At 2:53 p.m. CT, Valor's Salesforce data shows that someone—believed to be Andrew Vick—logged in to Valor's Salesforce platform from an IP address registered to a local internet service provider serving the Kerrville, Texas area, using Hegert's Salesforce login credentials.  (Ex. 1, Pitts Decl. ¶ 49.)  Salesforce data shows that the latitude and longitude of the individual logging in were 30.04500 and -99.1417, which according to Google Maps is just 0.1 miles from TruCare's headquarters in Kerrville, Texas.  (*Id.*)  Upon information and belief, the geographic correlation between the unauthorized login and TruCare's headquarters is no coincidence.  (*Id.*)

71.      On this day, Hegert was working in the Valor office located in Centennial, Colorado, so it could not have been him.  (*Id.* ¶ 50.)

72.     Upon information and belief, at 2:53 p.m. CT on February 12, 2026, Andrew Vick utilized Hegert's Salesforce login credentials to access Valor's Salesforce platform from his iPhone in Kerrville, Texas. (*Id.*)

73.     Valor did not grant Andrew Vick permission to utilize Hegert's Salesforce credentials on February 12, 2026, or on any other date. (*Id.* ¶ 51.)

74.     Around approximately 4:30 p.m. CT, the Referral Source received a call from a man calling from 726-215-7873. (*Id.* ¶ 52.) The caller informed the Referral Source that Ortiz, the actual Valor technician, had been diverted to another call—a murder scene—but that another technician could be at her location soon. (*Id.*) The Referral Source had no reason to believe this caller was not from Valor. (*Id.*)

75.     A Google search reveals that 726-215-7873 is the number that Google associates with TruCare, as evidenced by the screenshot below. (*Id.* ¶ 53.)



76.     Upon information and belief, Defendants coordinated the February 12, 2026 call from 726-215-7873 claiming that Valor technician Ortiz had been diverted to another call and that a new technician would be sent to the Referral Source's job. (*Id.* ¶ 54.)

77.     At or around 4:33 p.m. CT, the Referral Source received a call from a man identifying himself as "Arturo Cruz," from the following phone number: 630-697-2638. (*Id.* ¶ 55.) Cruz informed the Referral Source that he would be the technician for the Bandera Job and would arrive shortly. ( *Id.*)

78.     At or around 3:59 p.m. CT on February 12, 2026—while Ortiz was driving to the Bandera Job—a woman with the phone number 210-382-3748 called Ortiz. (Ex. 3, Ortiz Decl. ¶ 5.) The woman told Ortiz that she was calling because the Referral Source needed to reschedule the cleaning appointment. (*Id.*) After this call, Ortiz turned around and returned home to San Antonio, believing the Bandera Job to be rescheduled. (*Id.*)

79.     A public records search shows that the number that the woman called Ortiz from, 210-382-3748, belongs to a Verizon Wireless account for a Genevieve Narvaiz in San Antonio, Texas. (Ex. 1, Pitts Decl. ¶ 56.)

80.     Upon information and belief, Defendants coordinated the February 12, 2026 call from this woman to Ortiz, claiming to be connected to the Referral Source and canceling the Valor services. (*Id.*)

81.     Approximately ten minutes after receiving a call from "Arturo Cruz," a technician arrived to the Referral Source's property to clean the site, driving a silver GMC pickup truck with no company logos. (*Id.* ¶ 57.) The technician wore gray khaki pants and a shirt, with no logos on the uniform. (*Id.*) Upon arrival, the technician began his work by taking pictures and videos of the scene. (*Id.*)

82.    After taking some photographs, the technician informed the Referral Source that he would be removing and transporting all materials—including biohazardous material—from the property in his truck, but that he needed to go to Home Depot to purchase bags to begin cleaning. (*Id.*).

83.    "Arturo Cruz" had a contract sent to the Referral Source for signature via Docusign, which the Referral Source signed via her smart phone.  (*Id.* ¶ 58.)

84.    The Referral Source, distraught over her family member's death, did not pay close attention to the contract.  (*Id.*)  Because the Referral Source had only contacted Valor for the Bandera Job, she had no reason to suspect the technician on site was not from Valor.  (*Id.*)

85.    After "Arturo Cruz" departed for the day, the Referral Source reviewed the contract she signed again and discovered that the company listed on the document was "TruCare BioClean," not Valor.  (*Id.*)

86.    Upon review of the email she had received with the completed contract, the Referral Source noticed that the email was sent to her by TruCare BioClean via Docusign and with the subject line "Completed: TruCare BioClean Services Agreement – [ADDRESS REDACTED], Bandera, TX."  (*Id.* ¶ 59.)  A screenshot of that email is included below:





87.     As shown below, the engagement letter that the Referral Source signed was counter-signed by TruCare representative "Drew Vick." (*Id.* ¶ 60.) The Referral Source had never heard the name "Drew Vick" or the company "TruCare BioClean" before this incident. (*Id.*)

**Authorization**

By signing below, Client authorizes TruCare BioClean to perform the services described above and agrees to the terms of this Agreement.

Printed Name / Title: ████████_____          Insurance Company: ███_____

Client Signature: ████_____ Date: 2/12/2026_____          Policy Number: ████_____

TruCare BioClean Representative: Drew Vick_____

Signature: Drew Vick_____ Date: 2/12/2026_____

-24-



## I.    Valor Discovers the Theft of the Bandera Job

88.    At or around 9:35 a.m. CT on February 13, 2026, Ortiz contacted the Referral Source to reschedule the postponed Bandera Job, as requested by the woman claiming to call on behalf of the Referral Source the prior day. (Ex. 3, Ortiz Decl. ¶ 7.) The Referral Source responded that "Valor" was already at her property cleaning the residence and that she had not called to reschedule her cleaning or have someone call to reschedule on her behalf. (*Id.* ¶¶ 8-9). Ortiz, the Valor technician assigned to the Bandera Job, was confused by this, as he was not physically present at the Bandera Job. (*Id.* ¶ 8) Ortiz was not aware of any other Valor technician assigned to the Bandera Job. (*Id.*)

89.    After the call with the Referral Source, Ortiz began to drive to the Bandera Job. (*Id.* ¶ 9.)

90.    Shortly thereafter, someone contacted the Referral Source, indicating there had been a "mix up" about the Bandera Job. (Ex. 1, Pitts Decl. ¶ 62.) Confused, the Referral Source arranged a three-way conference call with this TruCare representative individual—who identified himself as "Andrew"—and Albert Armendariz, a Market Sales Representative-Texas for Valor. (Armendariz Decl. ¶ 7)

91.    The TruCare representative called from 907-987-5393. (Pitts Decl. ¶ 62)

92.    Valor maintains its employees' personal cell phone numbers in the course of their employment for communication purposes. (*Id.* ¶ 63.) Valor has 907-987-5393 listed as a personal cell phone number for Andrew Vick. (*Id.*)

93.    Upon information and belief, Andrew Vick was the caller who identified himself as "Andrew" during this February 13, 2026 phone call with the Referral Source and Armendariz. (*Id.*)

94.     Armendariz asked the TruCare representative how the Valor technician was diverted from the Bandera Job and how TruCare, who had never been contacted by the Referral Source for the Bandera Job, had learned about the job and arrived at the location.  (Ex. 2, Armendariz Decl. ¶ 7.)  The TruCare representative said his company was "investigating" and would "rectify the situation"—a tacit acknowledgement that TruCare had no legitimate explanation for how it learned of the Bandera Job. (*Id.*)  The TruCare representative was informed that the TruCare technician on site needed to leave immediately, as the Referral Source only wanted Valor to perform the services at the property.  (Ex. 1, Pitts Decl. ¶ 62.)

95.     Upon information and belief, Andrew Vick is employed by TruCare because of his representations to the Referral Source and Armendariz on February 13, 2026 that he was a representative of TruCare; and his name and signature on the Referral Source's February 12, 2026 TruCare contract as the "TruCare BioClean Representative."  (*Id.* ¶ 64.)

96.     TruCare representatives—including Andrew Vick—had no independent way to know about the Bandera Job unless TruCare had knowledge from Valor's Salesforce platform. (*Id.* ¶ 65.)  There is no innocent explanation for how TruCare learned of the Bandera Job within minutes of it being logged into Valor's Salesforce system.

97.     The timing of Andrew Vick's termination—on January 5, 2026—and Andrew Vick's involvement in the Bandera Job—on February 12, 2026—combined with the access to Valor information that Andrew Vick had during his employment, made this incident highly suspicious to Valor.  (*Id.*)

98.     By the time Ortiz arrived at the Bandera Job, part of the site had been cleaned, and the other technician who cleaned the property had departed.  (Ex. 3, Ortiz Decl. ¶ 10.)

99.     Ultimately, Valor—through technician Ortiz—completed the Bandera Job for the Referral Source, as the Referral Source originally requested.  (*Id.* ¶ 11.)

100.     Although Valor ultimately completed the Bandera Job for the Referral Source, Valor has suffered an injury to its business reputation due to TruCare's conduct.  (Ex. 1, Pitts Decl. ¶ 66.)  Since the discovery of the TruCare scheme on February 13, 2026, Valor has already spent, and will likely continue to spend, significant time and financial resources to maintain its business relations and employee morale.  (*Id.*)

101.     After learning about the Bandera Job, Valor has spent more than $5,000 on this incident, including a forensic investigation, as explained further below.  (*Id.*)

**J.     Hegert's Account of the Bandera Job**

102.     Around the time of the conference call on February 13, 2026 between TruCare, the Referral Source and Armendariz, the Referral Source sent Valor a copy of the contract she signed with TruCare.  (Ex. 2, Armendariz Decl. ¶ 6.)

103.     Following this call, Armendariz consulted with Valor's Regional Sales Manager for Texas, Chris Crandell, to relay information about the Bandera Job and what had occurred on his call with the Referral Source and the TruCare representative.  (*Id.* ¶ 8.)  Crandell contacted Rusty Waters, Valor's Vice President of Operations, about the situation.  (Exhibit 4, Declaration of Rusty Waters (hereinafter "Waters Decl.") ¶ 7.)  After this, Waters went to discuss the situation with Hegert, who also worked from Valor's Colorado office (*Id.* ¶ 8.).

104.     During an initial conversation with Waters, Hegert reported that he had dispatched Ortiz—who lives in San Antonio, approximately an hour from Bandera, Texas—to perform the work.  (*Id.* ¶ 9.)  Following up after that conversation, Hegert further reported to Waters that Ortiz had been "called off" the Bandera Job, though Hegert indicated he would need to investigate the reason for the cancellation.  (*Id.* ¶ 10.)  Waters found this "call off" suspicious.  (*Id.* ¶ 11.)

105.    Approximately one hour later, Hegert followed up again with Waters.  (*Id.* ¶ 12.) Hegert advised Waters that the job had been cancelled because a woman called Valor, claiming to be involved in the Referral Source cleanup, and stated that Valor's services were no longer needed. (*Id.*)  Hegert also shared that he himself had spoken directly with the Referral Source, who claimed to be completely unaware of anyone calling to reschedule services and that the Referral Source believed "Valor" was actively handling the cleanup at the property.  (*Id.* ¶ 13.)  It is unclear whether Hegert was lying to cover up the TruCare scheme or was purposefully misleading Waters. (*Id.* ¶ 14.)

**K.    Hegert's Resignation, Confession, and Destruction of Evidence**

106.    When Waters received the Referral Source's signed TruCare agreement and saw Andrew Vick's signature on the agreement, he was immediately concerned about poaching and impersonation by TruCare.  (*Id.* ¶¶ 15-16.)  Waters pulled Hegert into another discussion to address the situation.  (*Id.* ¶ 18.)  When Waters initiated the conversation and showed Hegert the signed TruCare agreement, Hegert's conscience appeared to overwhelm him.  (*Id.* ¶ 18.)  Hegert broke down and announced that it was his last day at Valor, and he intended to resign.  (*Id.* ¶¶ 18-19.) Hegert stated that he could not believe he had gotten himself into this type of situation and that he could no longer perform his job duties at Valor.  (*Id.* ¶ 20.)

107.    During this discussion, Hegert made critical admissions.  Hegert admitted that Andrew Vick likely had access to Hegert's Valor accounts and acknowledged that Hegert continued communicating with Andrew Vick after Andrew Vick left Valor and thus lost access to Valor's platforms.  (*Id.* ¶ 20.)  Hegert stated that he felt "betrayed" by Andrew Vick's actions, a statement that confirms Hegert understood his conduct in providing Andrew Vick access to Valor's systems was wrongful.  (*Id.* ¶ 20.)  Hegert told Waters that Valor should lock its systems

immediately because of Andrew Vick's access to Valor's systems through Hegert's accounts. (*Id.* ¶ 21.)

108.   In a further demonstration of consciousness of guilt, before his resignation, Hegert, upon information and belief, attempted to destroy evidence by surreptitiously wiping (i.e., completing factory reset and deleting the eSIM card) his Company-owned iPhone and attempting to wipe and reset his Valor-issued laptop. (*Id.* ¶ 23.)

## L.   Forensic Evidence of How Hegert Conspired with Andrew Vick

109.   Upon Hegert's revelation regarding his contact with Andrew Vick, Valor conducted a forensic analysis and investigated Hegert's Salesforce login history. (Ex. 1, Pitts Decl. ¶ 67.) This investigation revealed significant forensic evidence of the conspiracy between Hegert and Andrew Vick. (*Id.*)

110.   Investigation of logins on Hegert's Salesforce account revealed that beginning on February 9, 2026, there were several logins to Hegert's Salesforce account originating from an iPhone in Kerrville, Texas, where TruCare is located. (*Id.* ¶ 68.)

111.   These Kerrville logins began on February 9, 2026—a little over a month after Andrew Vick's termination from Valor. (*Id.*)

112.   Prior to February 9, 2026, during the preceding 60 days, all logins to Hegert's Salesforce account occurred from only two locations: Denver, Colorado, where Valor's office is located, and Colorado Springs, Colorado, where upon information and belief, Hegert resides. (*Id.* ¶ 69.)

113.   On February 9, 2026 at 8:38 p.m. CT, an iPhone in Kerrville, Texas, 78028 attempted to log into Hegert's Salesforce account using Hegert's Salesforce credentials from IP Address 173.224.3.146, which is an address registered to a local internet service provider serving the Kerrville, Texas area. (*Id.* ¶ 70.)

114. As this was the first attempt to access Hegert's Salesforce account from this device, the sign-on triggered a multi-factor authentication request. (*Id.*) The multi-factor authentication was successfully completed, according to Salesforce login data, such that this device gained access to Valor's Salesforce platform on February 9, 2026, at 8:39 p.m. CT. (*Id.*) This successful completion of multi-factor authentication indicates that Hegert actively assisted the unauthorized access by providing not only his credentials but also the multi-factor authentication "verification code." (*Id.*)

115. Prior to February 9, 2026, during the preceding 60 days, all logins to Hegert's Salesforce account occurred from either an Internet browser or an Android device. (*Id.* ¶ 71.) The login on February 9, 2026 was the first iPhone login using Hegert's credentials during this period. (*Id.*)

116. On February 11, 2026 at 4:53 p.m. CT, an iPhone in Kerrville, Texas, from the same IP Address (173.224.3.146) logged into Valor's Salesforce platform again using Hegert's credentials. (*Id.* ¶ 72.) This login no longer required a multi-factor authentication, as the iPhone from this IP Adress had previously logged into the system on February 9, 2026. (*Id.*)

117. Again on February 12, 2026 at 2:53 p.m. CT—the day of the Bandera Job theft—an iPhone in Kerrville, Texas, from the same IP Address (173.224.3.146) logged into Valor's Salesforce platform using Hegert's credentials. (*Id.* ¶ 73.)

118. Salesforce data shows that the latitude and longitude for this IP Address is 30.045100, -99.1417. (*Id.* ¶ 74.) A Google search puts this location by the Guadalupe River in Kerrville, Texas, approximately a 0.1-mile drive from TruCare's location at 819 Water Street, Kerrville, TX 78028 listed on its website. (*Id.*)



119.    The Salesforce login at 2:53 p.m. CT on February 12, 2026, using Hegert's credentials occurred approximately 19 minutes after Valor logged the inbound call from the Referral Source at 2:34 p.m. CT in Salesforce. (*Id.* ¶ 75.)  This timing is not coincidental. (*Id.*)  It demonstrates that the unauthorized user was monitoring Valor's Salesforce system for new job opportunities to steal.  (*Id.*)

120.    Upon information and belief, Andrew Vick utilized Hegert's Salesforce credentials on February 12, 2026 to gain access to Valor's Salesforce platform to learn about the Bandera Job. (*Id.*)

121.    Hegert's Salesforce data also showed access using his personalized credentials on February 9-12, 2026 from another IP Address (174.255.120.9).  (*Id.* ¶ 76.).  This access indicates that Hegert likely provided unauthorized access to additional third parties beyond Andrew Vick. (*Id.*)

**M.    Cease and Desist Letters**

122.    Shortly after discovering Defendants' misconduct, Valor sent Andrew Vick and TruCare cease and desist letters on February 16, 2026, and to Hegert on February 18, 2026.  (*Id.* ¶ 77.)   The letters demanded that Andrew Vick, TruCare, and Hegert cease and desist from engaging in any conduct causing substantial harm to Valor's business interests, including but not limited to: (1) stealing, accessing, and using Valor's confidential and proprietary business information and trade secrets; (2) engaging in fraudulent misrepresentation in connection with TruCare; and (3) fraudulently using Valor's assets.  (*Id.*)  Valor also demanded that Hegert cease and desist from destroying Valor property.  (*Id.*)  The cease and desist letters requested that Andrew Vick, TruCare, and Hegert identify any Valor property in their respective possession; return any Valor property and destroy any copies; and preserve information relevant to the cease and desist letter.  (*Id.*)

123.    On February 18, 2026, Andrew Vick responded to Valor's cease and desist letter via email, acknowledging receipt of the letter and denying possession of any Valor property.  (*Id.* ¶ 78.)   On February 20, 2026, Deondrey Russell informed Valor that the firm of Almanza, Blackburn, Dickie & Mitchell LLP represented TruCare and promised a substantive response the following week.  (*Id.*)  As of March 4, 2026, Valor has not received a substantive response from TruCare's counsel.  (*Id.*)  As of March 4, 2026, Valor has not received any response from Hegert. (*Id.*)

124.    After receiving no assurances that Defendants would cease their conduct, that Valor's confidential and proprietary business information and trade secrets would be protected, or that Defendants would stop engaging in fraudulent misrepresentations or using Valor's assets, Valor had no other choice but to inform Andrew Vick, TruCare, and Hegert that it would move

for a temporary restraining order to protect its confidential information and trade secrets.  (*Id.* ¶ 79.)

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836 *et seq.***
**(Against Andrew Vick, TruCare, Hegert)**

125.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

126.    Andrew Vick, Hegert, and TruCare have violated one or more provisions of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*.

127.    Valor's Confidential Information includes trade secrets, including: (a) client and customer contact information maintained on Valor's Salesforce platform; (b) specialized training materials in highly technical biohazard remediation procedures; (c) product and service specifications; (d) customer lists and prospective customer lists; (e) current and anticipated customer job specifications; (f) pricing information and price lists; (g) business plans and strategies; and (h) sales leads.  Valor utilizes this Confidential Information to communicate with and engage customers throughout the country and provide biohazard remediation and cleanup services across the lower 48 states.

128.    As demonstrated by the Bandera Job and Valor's subsequent investigation, Defendants accessed and exploited Valor's Salesforce platform containing sales leads, client contact information, customer lists, prospective customer lists, and current and anticipated customer job specifications for Valor's customers nationwide.  Valor invested significant time, effort, and financial resources in developing this information.  Defendants not only had access to these trade secrets, but actively used—and continue to threaten to use—this information for Defendants' benefit and to Valor's detriment.

-34-

129. Valor has taken reasonable measures to maintain the secrecy of its trade secret information, including: (a) requiring employees to agree to confidentiality provisions as a condition of employment; (b) promulgating and enforcing confidentiality and information security policies; (c) restricting CallRail access to authorized, active employees through password-protected authentication processes; (d) restricting Salesforce CRM system access to authorized, active employees through password-protected authentication processes, including multi-factor authentication; and/or (e) utilizing audit and monitoring capabilities within the Salesforce CRM system to track access to Valor's information.

130. Valor's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use—including Valor's competitors. A competitor with access to Valor's trade secrets could replicate Valor's services, precisely as TruCare has done. Valor derives substantial economic value from maintaining the confidentiality of its client contact information, sales leads, customer lists, prospective customer lists, and current and anticipated customer job specifications for Valor's customers nationwide. This information within Valor's Salesforce platform is precisely what Andrew Vick and TruCare exploited to divert business from Valor to TruCare.

131. Without authorization from Valor, Andrew Vick misappropriated, threatens to misappropriate, and inevitably will continue to misappropriate Valor's trade secrets in a willful manner and with deliberate intent to injure Valor and benefit TruCare, by, among other things: (a) accessing Valor's Salesforce platform during his employment to obtain Valor customer information and distribute it to TruCare to divert business opportunities away from Valor; (b) upon information and belief, accessing the Valor Salesforce platform to obtain Valor customer

information and capitalize on Valor's business opportunities following the termination of his employment with Valor; (c) following his termination, failing to return Valor's property, including his Valor-issued laptop containing proprietary documents and Confidential Information; (d) interfering with Valor's active Bandera Job, which Andrew Vick learned of only through his unauthorized use of Hegert's Salesforce credentials; and (e) using, disclosing, or threatening to use or disclose—without Valor's consent—Valor's confidential and trade secret information.

132.    On information and belief, Andrew Vick is employed by TruCare, as evidenced by: (a) his representations to the Referral Source and Armendariz on February 13, 2026 that he was a representative of TruCare; and (b) his name and signature on the Referral Source's February 12, 2026 TruCare contract as the "TruCare BioClean Representative."  As an agent of TruCare, Andrew Vick continues to possess his Valor-issued laptop, which contains Valor's proprietary documents and Confidential Information.

133.    Without authorization from Valor, TruCare misappropriated, threatens to misappropriate, and inevitably will continue to misappropriate Valor's trade secrets in a willful manner and with deliberate intent to injure Valor and enhance TruCare's competitive position by, among other things: (a) acquiring, receiving, or possessing—or inevitably acquiring, receiving, or possessing—Valor's trade secrets from Andrew Vick, knowing these trade secrets were misappropriated without Valor's authorization; (b) employing or otherwise engaging Andrew Vick to use Valor's trade secrets while Andrew Vick was employed by Valor; (c) using these trade secrets to service Valor customers under the TruCare name; and (d) employing or otherwise engaging Andrew Vick while he retains possession of Valor's laptop and proprietary and Confidential Information contained therein.

134.    Without authorization from Valor, Hegert misappropriated Valor's trade secrets in a willful manner and with a deliberate intent to injure Valor and benefit TruCare, by providing Andrew Vick—and potentially other third parties, pending Valor's investigation—access to Hegert's login information to the Valor Salesforce platform, enabling the unauthorized acquisition of Valor customer information.

135.    Both Andrew Vick and Hegert owed duties to Valor to maintain the secrecy and limit the use of its trade secrets.  Valor communicated its trade secrets to each in confidence, and each knew at the time that the information was obtained under circumstances giving rise to such duties.

136.    Andrew Vick and TruCare acquired the trade secrets by improper means and have disclosed and utilized—or inevitably will disclose and utilize—these trade secrets without Valor's consent to perform competitive services.

137.    Defendants have obtained, and will continue to obtain, substantial economic value from the disclosure and use of Valor's trade secrets by avoiding the years of effort and significant financial investment Valor expended to develop this information.  TruCare has used and will continue to use information contained in Valor's Salesforce platform to divert customers and jobs from Valor, while avoiding the legitimate costs of acquiring such business.  The potential use and misuse of the customer information Defendants have misappropriated from Valor is virtually unlimited.

138.    As a direct and proximate result of Defendants' unlawful conduct, Valor has suffered and will continue to suffer irreparable harm, injury, and loss.  Andrew Vick's continued possession of the Valor-issued laptop, and the proprietary and Confidential Information contained therein, continues to cause ongoing irreparable harm and injury to Valor.  Unless enjoined,

Defendants will continue to use Valor's trade secret information to compete unfairly, and Valor will continue to suffer irreparable harm that cannot be remedied solely through monetary damages.

139.   Beginning in the summer of 2025, Valor experienced a significant and unexplained number of no-insurance job losses.  Specifically, Valor has suffered lost business, as reflected by the conversion analysis showing that Andrew Vick's no-insurance loss rate was approximately double the Company average.  As a direct and proximate result of Defendants' unlawful conduct, Valor has suffered lost business and other actual damages to be proven at trial.

140.   Defendants have willfully and maliciously misappropriated Valor's trade secret information to benefit TruCare at the expense of Valor and its vulnerable customers, including the Referral Source.  Defendants obtained these trade secrets through one or more of the following unlawful means: (a) Andrew Vick's unauthorized use of his Salesforce credentials for non-Valor purposes during his employment; (b) the Valor-issued laptop Andrew Vick has failed to return; and/or (c) Hegert's Salesforce credentials, which Defendants accessed after Andrew Vick's employment ended and his own Valor Salesforce access was revoked.  This willful and malicious conduct entitles Valor to an award of exemplary damages and attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(C)–(D).

141.   In addition to seeking damages, Valor seeks injunctive relief for the ongoing and threatened harm caused by Defendants' misappropriation of Valor's trade secrets. *See* 18 U.S.C. § 1836(3)(A)–(D); Fed. R. Civ. P. 65.  Unless enjoined by this Court: Andrew Vick will continue to misappropriate Valor's trade secrets, and TruCare will continue to use Valor's misappropriated trade secrets.  Andrew Vick continues to possess his Valor-issued laptop, including the proprietary information and Confidential Information stored therein.  Defendants

must be enjoined to prevent continued harm to Valor through further misappropriation of Valor's Confidential Information and trade secrets.

## COUNT II
### MISAPPROPRIATION OF TRADE SECRETS UNDER THE TEXAS UNIFORM TRADE SECRETS ACT ("TUTSA"), TEX. CIV. REM. & PRAC. CODE § 134A.001 *et seq.*
### (Against Andrew Vick, TruCare, Hegert)

142.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

143.    Andrew Vick, Hegert, and TruCare have violated one or more provisions of the Texas Uniform Trade Secrets Act ("TUTSA").

144.    Valor owns trade secrets and Confidential Information, including (a) compilations of client and customer contact information maintained on Valor's Salesforce platform; (b) specialized training materials relating to highly technical biohazard remediation procedures; (c) product and service specifications; (d) customer lists and prospective customer lists; (e) current and anticipated customer job specifications; (f) pricing information and price lists, (g) business plans and strategies; and (h) sales leads.  Valor utilizes this Confidential Information to communicate with and engage customers throughout the country and to provide biohazard remediation and cleanup services across the lower 48 states.

145.    Andrew Vick and TruCare were privy to Valor's Confidential Information and trade secrets by improper means.  This information provided Andrew Vick and TruCare a valuable advantage in the marketplace.

146.    As evidenced by the Bandera Job and Valor's subsequent investigation, Defendants accessed and exploited Valor's Salesforce platform containing client contact information, customer lists, prospective customer lists, and current and anticipated customer job specifications for Valor's customers nationwide.  Valor invested significant time, effort, and financial resources

in developing this proprietary information.  Defendants not only accessed these trade secrets, but used—and continue to threaten to use—this information for Defendants' benefit and to Valor's detriment.

147.    Valor has taken reasonable measures to keep the secrecy of its trade secret information, including: (a) requiring employees to agree to confidentiality provisions as a condition of employment; (b) promulgating and enforcing confidentiality and information security policies; (c) restricting CallRail access to authorized, active employees through password-protected authentication processes; (d) restricting Salesforce CRM system access to authorized, active employees through password-protected authentication processes, including multi-factor authentication; and/or (e) utilizing audit and monitoring capabilities within the Salesforce CRM system to track access to Valor's information.

148.    Valor's trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use, such as Valor's competitors. A competitor with access to Valor's trade secrets could replicate Valor's services, precisely as TruCare has done.  Valor derives substantial economic value from maintaining the confidentiality of its client contact information, customer lists, prospective customer lists, and current and anticipated customer job specifications for Valor's customers nationwide.  In fact, this very information in Valor's Salesforce platform is precisely what Andrew Vick and TruCare used to divert business away from Valor to TruCare.

149.    Without authorization or approval from Valor, Andrew Vick improperly acquired Valor's trade secrets in a willful manner and with a deliberate intent to injure Valor and benefit TruCare by, among other things: (a) accessing the Valor Salesforce platform during his

employment to obtain Valor customer information and distribute it to TruCare to divert business opportunities away from Valor; (b) accessing the Valor's Salesforce platform after his employment with Valor ended to obtain Valor customer information distribute it to TruCare to capitalize on Valor's business opportunities; (c) following his termination, failing to return Valor's property, including his Valor-issued laptop containing proprietary documents and Confidential Information; (d) interfering with Valor's active Bandera Job, which Andrew Vick learned of only through his unauthorized use of Hegert's Salesforce credentials; and (e) using, disclosing, or threatening to use or disclose—without Valor's consent—Valor's confidential and trade secret information.

150.    Without authorization from Valor, TruCare improperly acquired Valor's trade secrets in a willful manner and with a deliberate intent to injure Valor and enhance TruCare's competitive position, by, among other things: acquiring, receiving, or possessing—or inevitably acquiring, receiving, or possessing—Valor's trade secrets, knowing the same to have been misappropriated without Valor's authorization, and using those trade secrets to service Valor's customers under the TruCare name.  On information and belief, Andrew Vick is employed by TruCare, as evidenced by his representations to the Referral Source and Armendariz on February 13, 2026 that he was a representative of TruCare, and his name and signature on the Referral Source's February 12, 2026 TruCare contract as the "TruCare BioClean Representative."  As an agent of TruCare, Andrew Vick continues to possess his Valor-issued laptop, which contains Valor's proprietary documents and Confidential Information.

151.    Without authorization from Valor, Hegert improperly shared Valor's trade secrets in a willful manner and with a deliberate intent to injure Valor and benefit TruCare, by providing Andrew Vick—and potentially other third parties, pending Valor's ongoing investigation—access

to Hegert's login credentials for the Valor Salesforce platform, enabling the unauthorized acquisition of Valor customer information.

152.    It is inevitable—and already proven by the February 12, 2026 Bandera Job—that Andrew Vick and TruCare have used, or will continue to use, Valor's trade secrets to TruCare's advantage and with the express purpose of damaging Valor, or with reckless disregard for the damage to Valor. The threat of ongoing misappropriation remains because Andrew Vick continues to possess his Valor-issued laptop and the proprietary and confidential information contained therein.

153.    Beginning in the summer of 2025, Valor experienced a significant number of no-insurance lost jobs. Specifically, Valor has suffered lost business, as reflected by the conversion analysis showing that Andrew Vick's no-insurance loss rate was approximately double the Company average. As a direct and proximate result of Defendants' unlawful conduct, Valor has suffered lost business, lost goodwill, diminished competitive advantage, loss of market share, and other actual damages to be proven at trial.

154.    Defendants have willfully and maliciously misappropriated Valor's trade secret information to benefit TruCare at the expense of Valor and its vulnerable customers, including the Referral Source. Defendants obtained these trade secrets through one or more of the following unlawful means: (a) Andrew Vick's unauthorized use of his Salesforce credentials for non-Valor purposes during his employment; (b) the Valor-issued laptop Andrew Vick has failed to return; and/or (c) Hegert's Salesforce credentials, which Defendants accessed after Andrew Vick's employment ended and his own Valor Salesforce access was revoked. This willful and malicious conduct entitles Valor to an award of exemplary damages and attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 134A.004–134A.005.

155.    In addition to seeking damages, Valor seeks injunctive relief for the ongoing and threatened harm caused by Defendants' misappropriation of trade secrets. *See* Tex. Civ. Prac. & Rem. Code §§ 134A.003 – 134A.005; Fed. R. Civ. P. 65. Unless enjoined by this Court: Andrew Vick will continue to misappropriate Valor's trade secrets and TruCare will continue to use Valor's misappropriated trade secrets. Andrew Vick continues to possess his Valor-issued laptop, including the proprietary information and Confidential Information stored therein. Defendants must be enjoined to prevent continued harm to Valor through further misappropriation of Valor's Confidential Information and trade secrets.

## COUNT III
## VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA"),
### 18 U.S.C. § 1030(a)(2), (a)(4), (a)(5)
### (Against Andrew Vick)

156.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

157.    The CFAA, 18 U.S.C. § 1030 *et seq.*, prohibits, among other things, (a) intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer; and (b) knowingly accessing a protected computer without authorization or exceeding authorized access, to further an intended fraud and obtaining something of value.

158.    Valor maintains and operates a Salesforce platform, an Internet-based platform, that is used in interstate and foreign commerce and communication. The Valor Salesforce platform constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2). Valor employees throughout the United States utilize the Valor Salesforce platform to track customer data for customers throughout the country.

159. The Valor Salesforce platform contains confidential, proprietary, and trade secret information belonging to Valor, including but not limited to compilations of customer data, sales leads, lists of customer contact information, details on the customer's insurance coverage, and project information.

160. Access to the Valor Salesforce platform is restricted to authorized users who are issued unique login credentials by Valor. Access requires several layers of authentication, including a username, password, and multi-factor authentication. Use of the Valor Salesforce platform is restricted to Valor-related business purposes. Authorized users are prohibited from distributing information contained in Valor's Salesforce platform to third parties, including competing businesses.

161. Valor also issued Andrew Vick a laptop during his employment with the Company, through which he communicated with clients, customers, and third parties to discuss and provide services for Valor throughout the country. Andrew Vick's Valor-issued laptop constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

162. Access to a Valor laptop is restricted to current employees who are issued laptops. Authorized use of a Valor-issued laptop is restricted to Valor-related business purposes.

163. During his employment with Valor, Andrew Vick was not authorized to access Valor's Salesforce platform to obtain or distribute information regarding Valor's prospective or actual customers to third parties, including competing businesses.

164. On information and belief, during his employment with Valor, Andrew Vick accessed Valor's Salesforce platform using a protected computer to obtain information regarding Valor prospective customers and jobs. On information and belief, after obtaining such information from Valor's Salesforce platform, Andrew Vick shared this information with TruCare, a direct

competitor of Valor.  On information and belief, Andrew Vick marked these prospective customers in Valor's Salesforce platform as "lost-no insurance" jobs, when in fact he was directing this business to TruCare for TruCare to complete the work.

165.    Andrew Vick's conduct in accessing Valor's Salesforce platform and obtaining information to benefit TruCare—contrary to any legitimate business purpose for Valor—exceeded his authorized access to Valor's Salesforce platform.

166.    On information and belief, during his employment, Andrew Vick also accessed his Valor-issued laptop and obtained information to benefit TruCare.  His conduct exceeded the authorized use of the laptop for Valor-related business purposes.

167.    Following his termination from Valor on January 5, 2026, Andrew Vick was no longer an authorized user of the Valor Salesforce platform, and he no longer maintained active login credentials to access the platform.  The information contained in Valor's Salesforce platform was not otherwise available to Andrew Vick after his employment with Valor ended.

168.    On information and belief, Andrew Vick knowingly and intentionally accessed the Valor Salesforce platform without authorization by using Hegert's login credentials.  Andrew Vick was not authorized by Valor to use Hegert's login credentials to access the Valor Salesforce platform.

169.    Through this unauthorized access, Andrew Vick obtained confidential information from the Valor Salesforce platform, including, at a minimum, information regarding the Bandera Job.  The full extent of confidential information obtained by Andrew Vick through this unauthorized access cannot be determined at this time and may extend well beyond the Bandera Job.

170. Andrew Vick's unauthorized access to the Valor Salesforce platform was intentional and was undertaken for the purpose of obtaining Valor's Confidential Information for Andrew Vick's own benefit and the benefit of TruCare.

171. As a former employee of Valor, Andrew Vick was aware of Valor's protocols and authorized uses of the Salesforce platform. Andrew Vick's post-employment conduct in accessing Valor's Salesforce platform using Hegert's login credentials—knowing that his own credentials would no longer provide access Valor's Salesforce platform—was not accidental. This conduct was deliberate and premeditated, designed to obtain information to which Andrew Vick was no longer entitled, for his own financial gain and for the financial gain of TruCare, as part of Defendants' ongoing unlawful scheme.

172. Andrew Vick was not authorized by Valor to use his Valor-issued laptop after his termination, and he failed to return it. After his termination on January 5, 2026, Andrew Vick continues to possess his Valor-issued laptop.

173. On information and belief, following his termination on January 5, 2026, Andrew Vick accessed his Valor-issued laptop and obtained information from that laptop. Andrew Vick's conduct in accessing his Valor-issued laptop after his termination—contrary to any legitimate business purpose for Valor—exceeds his authorized access to Valor's laptop.

174. On information and belief, through his unauthorized access, Andrew Vick obtained information from the Valor-issued laptop, including, but not limited to, proprietary documents and Confidential Information. The full extent of information obtained by Andrew Vick through his unauthorized access cannot be determined at this time.

175.    Andrew Vick's unauthorized access to the Valor-issued laptop was intentional and was undertaken for the purpose of obtaining Valor information for Andrew Vick's own benefit and the benefit of TruCare.

176.    As a direct and proximate result of Andrew Vick's violations of 18 U.S.C. § 1030, Valor has suffered damages and loss, as those terms are defined under 18 U.S.C. § 1030(e)(8) and (e)(11), aggregating at least $5,000 in value during a one-year period.  Valor's losses include, but are not limited to, costs incurred in responding to and investigating Andrew Vick's unauthorized access; conducting a forensic analysis, including analysis of the frequency of Andrew Vick's access; engaging counsel; and reputational damage resulting from Andrew Vick's unlawful access and misappropriation of Valor customer information.

177.    Andrew Vick's conduct constitutes a violation of 18 U.S.C. § 1030(a)(2), 18 U.S.C. § 1030(a)(4), and/or 18 U.S.C. § 1030(a)(5), entitling Valor to maintain this civil action and recover damages pursuant to 18 U.S.C. § 1030(g).

178.    In addition to seeking damages, Valor seeks injunctive relief.  Unless enjoined by this Court, Andrew Vick will (a) continue to access, use, and disclose Valor's Confidential Information obtained through the unauthorized access to the Salesforce platform; and (b) continue to access and use information contained on his Valor-issued laptop.  Andrew Vick must be enjoined to prevent continued harm to Valor for which there is no adequate remedy at law.

**COUNT IV**
**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA"),**
**18  U.S.C. § 1030(b)**
**(Against TruCare)**

179.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

180.    The CFAA prohibits, among other things, conspiring or attempting to conspire to commit a violation of the CFAA.  18 U.S.C. § 1030(b).

181.    Valor maintains and operates a Salesforce platform that is used in interstate and foreign commerce and communication.  Valor employees throughout the United States utilize the Valor Salesforce platform to track customer data for customers throughout the country.  Valor issued Andrew Vick a laptop during his employment with the Company, through which he communicated with clients, customers, and third parties to discuss and provide services for Valor throughout the country.  As set forth above, Valor's Salesforce platform and Andrew Vick's Valor-issued laptop each constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

182.    On information and belief, TruCare planned and executed a scheme to: (a) during Andrew Vick's employment with Valor, utilize Andrew Vick's Salesforce platform login credentials and Valor-issued laptop to gain information regarding Valor customers for TruCare's benefit; and (b) after Andrew Vick's employment with Valor ended, utilize Hegert's Salesforce platform login credentials and Andrew Vick's Valor-issued laptop to gain access to Valor's confidential information.

183.    On information and belief, TruCare knew that it did not have lawful access to Valor's Salesforce platform and customer information database, or Andrew Vick's Valor-issued laptop.  TruCare therefore orchestrated and executed its scheme to gain access to Valor's Salesforce platform and Andrew Vick's Valor-issued laptop in violation of the CFAA.

184. On information and belief, TruCare intended to defraud Valor and obtain something of value—namely, Valor's confidential customer information and business opportunities—through its conspiracy with Andrew Vick to violate the CFAA.

185. As a direct and proximate result of TruCare's conspiracy to violate 18 U.S.C. § 1030, Valor has suffered damages and loss, as those terms are defined under 18 U.S.C. § 1030(e)(8) and (e)(11), aggregating at least $5,000 in value during a one-year period.

186. TruCare's conduct constitutes a violation of 18 U.S.C. § 1030(b), entitling Valor to maintain this civil action and recover damages pursuant to 18 U.S.C. § 1030(g).

187. In addition to seeking damages, Valor seeks injunctive relief. Unless enjoined by this Court, TruCare will continue to access, use, and disclose Valor's information obtained through the unauthorized access, including accessing and using information contained on Andrew Vick's Valor-issued laptop which remains in his possession, causing Valor irreparable harm for which there is no adequate remedy at law.

## COUNT V
### VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA"), 18 U.S.C. § 1030(a)(6)
### (Against Hegert)

188. Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

189. The CFAA prohibits, among other things, knowingly transferring to another any password or similar information through which a computer may be accessed without authorization. 18 U.S.C. § 1030(a)(6).

190. Valor maintains and operates a Salesforce platform, an Internet-based platform. The Valor Salesforce platform constitutes a "protected computer" within the meaning of

-49-

18 U.S.C. § 1030(e)(2). Valor employees throughout the United States utilize the Valor Salesforce platform to track customers throughout the country.

191. The Valor Salesforce platform contains confidential, proprietary, and trade secret information belonging to Valor, including but not limited to customer data (including referral sources), job leads, customer contact information, details regarding customers' insurance coverage, and project information.

192. Access to the Valor Salesforce platform is restricted to authorized users who are issued unique login credentials by Valor.

193. Use of the Valor Salesforce platform is restricted to use for Valor-related business purposes. Authorized users are prohibited from distributing information contained in Valor's Salesforce platform to third parties, including competing businesses.

194. During his employment with Valor, Hegert was not authorized to access Valor's Salesforce platform to access or distribute information regarding Valor's prospective or actual customers to third parties, including competing businesses.

195. During his employment with Valor, Hegert maintained login credentials—including a username and password—to Valor's Salesforce platform. At times, login credentials in Salesforce also required multi-factor authentication by the user. Hegert was not authorized to share his Salesforce platform login information with third-parties.

196. On information and belief, Hegert transferred to Andrew Vick his username and password to access Valor's Salesforce platform. On information and belief, Hegert also provided the necessary multi-factor authentication verification code to Andrew Vick to complete the login process and gain access to Valor's Salesforce platform. On information and belief, Andrew Vick accessed Valor's Salesforce platform using Hegert's credentials on at least three occasions:

February 9, February 11, and February 12, 2026. This conduct was not inadvertent. Upon information and belief, someone using Hegert's Salesforce login credentials accessed Hegert's Salesforce account from Kerrville, Texas, despite Hegert being located in the Denver, Colorado area at the time.

197. Hegert's actions in providing his Salesforce login credentials to Andrew Vick—thereby permitting Andrew Vick effective access to Valor's Salesforce platform to further interests adverse to Valor's business—exceeded his authorized access to Valor's Salesforce platform for Valor business purposes.

198. As an employee of Valor, Hegert was aware of Valor's protocols and authorized uses of the Salesforce platform. Permitting Andrew Vick—following his termination from Valor—to access Valor's Salesforce platform using Hegert's login credentials was deliberate and premeditated. Hegert provided Andrew Vick with access to Valor's Salesforce platform, and thus to confidential information that Andrew Vick would not otherwise have been able to access, as part of the Defendants' ongoing unlawful scheme.

199. Hegert's knowledge that his conduct was impermissible is evident, from his behavior on February 13, 2026, when he broke down emotionally during a conversation with Waters and admitted that Andrew Vick likely had access to his accounts, stated he felt "betrayed" by Andrew Vick, and expressed disbelief that he had gotten himself into such a situation.

200. As a direct and proximate result of Hegert's violations of 18 U.S.C. § 1030, Valor has suffered damages and loss, as those terms are defined under 18 U.S.C. § 1030(e)(8) and (e)(11), aggregating at least $5,000 in value during a one-year period. Valor's losses include, but are not limited to, costs incurred in responding to and investigating the unauthorized access to Hegert's Salesforce account; conducting a forensic analysis, including analysis of Andrew Vick's

access using that account; engaging counsel; and reputational damage resulting from Andrew Vick's unlawful access and misappropriation of Valor customer information.

201.    Hegert's conduct constitutes a violation of 18 U.S.C. § 1030(a)(6), entitling Valor to maintain this civil action and recover damages pursuant to 18 U.S.C. § 1030(g).

## COUNT VI
## VIOLATIONS OF THE TEXAS HARMFUL ACCESS BY COMPUTER ACT ("HACA"), TEX. CIV. REM. & PRAC. CODE § 143.001 *et seq.*
### (Against Andrew Vick)

202.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

203.    Valor is the licensee of the Valor Salesforce platform and has the exclusive right to use, control, and restrict access to that platform.  As such, Valor is an "owner" of the Valor Salesforce platform within the meaning of Texas Penal Code § 33.01(15).

204.    Upon the termination of Andrew Vick's employment, any authorization he may have had to access Valor's Salesforce platform was immediately revoked, and his personal Salesforce login credentials were deactivated.

205.    On information and belief, Andrew Vick knowingly accessed the Valor Salesforce platform without Valor's consent by using the login credentials belonging to Hegert.  Andrew Vick knew that his personal login credentials had been deactivated following his termination, and he deliberately circumvented Valor's access controls by appropriating and using the login credentials of another employee—Hegert—who maintained valid access to the Valor Salesforce platform.

206.    Valor did not authorize or permit Andrew Vick to access the Valor Salesforce platform using Hegert's credentials, or by any other means, following his termination.

207.    Andrew Vick's conduct in knowingly accessing Valor's computer system owned by Valor, without Valor's consent, constitutes a breach of computer security under Texas Penal Code § 33.02 and Texas Civil Practice and Remedies Code § 143.001.

208.    Following the discovery of Andrew Vick's unauthorized conduct, Valor was required to conduct a forensic analysis to determine the extent, nature, and frequency of Andrew Vick's intrusion into the Valor Salesforce platform, including examination of Andrew Vick's unauthorized use of Hegert's login credentials.

209.    As a direct and proximate result of Andrew Vick's violation of Texas Penal Code § 33.02 and Texas Civil Practice and Remedies Code § 143.001, Valor has been injured and has suffered damages, including but not limited to the costs incurred in investigating, analyzing, and responding to Andrew Vick's unauthorized access; damage to goodwill; misappropriation of proprietary and confidential business information; and competitive harm.

210.    Valor is entitled to recover damages from Andrew Vick pursuant to Texas Civil Practice and Remedies Code §§ 143.001, 143.002, including actual damages, lost profits, and other economic damages proximately caused by Andrew Vick's conduct as well as attorney's fees and costs.

## COUNT VII
### BREACH OF CONTRACT
### (Against Andrew Vick, Hegert)

211.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

212.    Andrew Vick and Hegert each signed their respective Confidentiality Agreements with Valor.

213. In the Confidentiality Agreement, Andrew Vick and Hegert each agreed that he would "protect Valor's confidential and proprietary information" and "hold such information in trust and confidence for Valor's sole and exclusive use and benefit."

214. The Confidentiality Agreement constitutes a valid, binding, and enforceable contract under Texas law.

215. Andrew Vick and Hegert each also agreed to a Restrictive Covenant Agreement.

216. In the Restrictive Covenant Agreement, Andrew Vick and Hegert each agreed, as relevant here, that he would not (a) solicit, divert, or take away business from, or compete with Valor; (b) manage, be employed or engaged by, or perform any services for and entity engaged in the same or similar business as Valor; or (c) engage in any practices in effect to evade the restrictive covenant provisions.

217. The Restrictive Covenant Agreement constitutes a valid, binding, and enforceable contract under Texas law.

218. On information and belief, Andrew Vick breached the contracts by (a) divulging and using Confidential Information gained during his employment with Valor to TruCare or to agents of TruCare for the benefit of TruCare; (b) failing to return all of Valor's property and Confidential Information following his termination; (c) engaging in conduct during his employment that conflicted with his obligations to Valor, including performing services for an entity in the same business as Valor (TruCare); and (d) interfering with Valor's customers to change their relationship with Valor and to contract with TruCare.

219. On information and belief, through his current employment or working relationship with TruCare—another biohazard remediation and cleanup service—Andrew Vick has further breached the Restrictive Covenant Agreement by engaging in employment or "perform[ing] any

services for . . . any business, company, partnership, organization, or proprietorship or other entity that is engaged in the same or similar business as" Valor.

220.    Andrew Vick's breaches have caused and will continue to cause Valor imminent and irreparable harm in the form of lost goodwill, diminished competitive advantage, loss of market share, and lost existing and potential business opportunities unless restrained and enjoined by this Court.

221.    Hegert breached the contracts by (a) engaging in conduct that conflicted with his obligations to Valor during his employment, including performing services for an entity in the same business as Valor (TruCare); (b) permitting the use of his Salesforce login credentials by third parties directly adverse to Valor's business, including but not limited to, Andrew Vick; and (c) engaging in evasive practices with his Salesforce login credentials that ultimately permitted Andrew Vick to interfere with Valor's customers to change their relationship with Valor. Although Hegert may not have been employed by, or performed services directly for, TruCare, the Restrictive Covenant Agreement prohibits Hegert—and other Valor employees—from engaging in conduct that in effect operates to evade the restrictive covenants.

222.    Hegert's breaches have likewise caused and will continue to cause Valor imminent and irreparable harm in the form of lost goodwill, diminished competitive advantage, loss of market share, and lost existing and potential business opportunities unless restrained and enjoined by this Court.

223.    Therefore, in addition to seeking damages that are capable of calculation, attorney's fees, and costs, Valor seeks injunctive relief for the harm caused by Andrew Vick and Hegert's breaches and an order requiring specific performance of Andrew Vick and Hegert's obligations under the Confidentiality Agreement and Restrictive Covenant Agreement. *See* Tex. Civ. Prac. &

Rem. Code §§ 38.001(b)(8), 65.011; Tex. Bus. & Comm. Code § 15.51; Fed. R. Civ. P. 65(d). Without injunctive relief, Andrew Vick's continued employment with TruCare and continued possession of Valor's laptop—and the proprietary documents and Confidential Information stored therein—will enable Andrew Vick to continue to breach his contractual duties to Valor.

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**(Against Andrew Vick, Hegert)**

224.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

225.    As employees, Andrew Vick and Hegert each owed Valor fiduciary duties, including the duty of loyalty, the duty to act in good faith, and the duty not to act adversely to Valor's interests.  Both occupied positions of trust and confidence with respect to Valor's Confidential Information, trade secrets, and customer relationships.

226.    Andrew Vick breached his fiduciary duties to Valor by, among other things: (a) upon information and belief, reporting as "lost-no insurance" Valor jobs in the Salesforce platform that were actually diverted for the benefit of TruCare during his employment with Valor; (b) accessing the Valor Salesforce platform following his termination without authorization using Hegert's login credentials; (c) obtaining Valor's Confidential Information, including information regarding the Bandera Job, without Valor's knowledge or consent; and (d) using Valor's Confidential Information for Andrew Vick's own benefit or for the benefit of TruCare, a direct competitor of Valor.

227.    Hegert breached his fiduciary duties to Valor by, among other things: (a) permitting Andrew Vick to access the Valor Salesforce platform using Hegert's login credentials, following Andrew Vick's termination from Valor; (b) permitting Andrew Vick to obtain Valor's Confidential Information, including information regarding the Bandera Job, without Valor's

knowledge or consent; and (c) permitting Andrew Vick to use Valor's Confidential Information for the benefit of Andrew Vick and TruCare.

228.    Andrew Vick and Hegert's breaches of fiduciary duty—designed to benefit themselves, each other, and/or TruCare—were committed knowingly, intentionally, and in bad faith, with full knowledge that their behavior was adverse to Valor's interests and in violation of the trust and confidence Valor placed in them.  In fact, when confronted, Hegert became severely emotional and broke down, evidencing that Hegert knew his conduct was wrongful.

229.    As a direct and proximate result, Valor has suffered damages, including, but not limited to, loss of competitive advantage, lost profits, and other economic harm.

230.    Andrew Vick and Hegert's conduct was willful, malicious, and undertaken with conscious indifference to Valor's rights, entitling Valor to an award of exemplary damages.

231.    Andrew Vick still maintains access to his Valor-issued laptop, including the proprietary information and Confidential Information included therein.  Unless enjoined, Andrew Vick can continue to harm Valor through further misappropriation of Valor's Confidential Information, further compromising Valor's valuable referral sources contained on his Valor-issued laptop, and using the unknown number of proprietary documents and Confidential Information on his laptop.  Unless enjoined by this Court, Andrew Vick will continue to use Valor's Confidential Information for the benefit of Defendants, causing Valor irreparable harm for which there is no adequate remedy at law.

## COUNT IX
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against All Defendants)

232.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

233. Valor had existing and prospective business relationships with third parties, including but not limited to the Referral Source and other prospective customers tracked in the Valor Salesforce platform.

234. The Referral Source contacted Valor to engage Valor's services for her biohazard cleanup project and requested that a Valor technician clean her property. Valor directed Ortiz to travel to the Referral Source's property to complete the Bandera Job. Given the Referral Source's request for services, and Valor's steps taken to provide those services, it was reasonably likely that the Referral Source would enter into a business relationship with Valor.

235. Andrew Vick committed independently tortious and unlawful acts, including but not limited to: the misappropriation of trade secrets in violation of the DTSA and TUTSA; unauthorized access to the Valor Salesforce platform in violation of CFAA and HACA; breach of his confidentiality and restrictive covenant provisions; breach of fiduciary duties; civil conspiracy; conversion; and fraud, as alleged herein. Upon information and belief, Andrew Vick's acts—including utilizing the Valor Salesforce platform during his employment for the benefit of himself and TruCare; encouraging Hegert to breach his restrictive covenants, confidentiality obligations, and duties of loyalty to Valor; and accessing the Valor Salesforce platform using Hegert's login credentials—constitute tortious and unlawful acts.

236. Hegert committed independently tortious and unlawful acts, including but not limited to: misappropriation of trade secrets in violation of the DTSA and TUTSA; unauthorized transfer of password information in violation of CFAA; breach of his confidentiality and restrictive covenant provisions; breach of fiduciary duties; and civil conspiracy, as alleged herein. Upon information and belief, Hegert's acts—including breaching his restrictive covenants, confidentiality obligations, and duties of loyalty to Valor; and permitting Andrew Vick to access

the Valor Salesforce platform using Hegert's login credentials—constitute tortious and unlawful acts.

237.    TruCare committed independently tortious and unlawful acts, including but not limited to: misappropriation of trade secrets in violation of the DTSA and TUTSA; conspiring to commit a violation of the CFAA; tortious interference with contract; civil conspiracy; unjust enrichment; conversion; and fraud, as alleged herein.

238.    Colton and Garrett Vick, as agents of TruCare, committed independently tortious and unlawful acts, including but not limited to: tortious interference with contract; civil conspiracy; and unjust enrichment, as alleged herein.

239.    Collectively, Defendants' independently tortious and unlawful scheme utilized information contained in Valor's Salesforce platform to divert Valor's legitimate business opportunities to TruCare, including but not limited to the Referral Source and the Bandera Job on February 12, 2026.  Valor's statistical analysis of Salesforce CRM data—reflecting Andrew Vick's higher no-insurance job loss rate—combined with Defendants' February 12, 2026 conduct relating to the Bandera Job, is illustrative of how Defendants schemed to interfere with Valor's business relations.

240.    On information and belief, Defendants used the Confidential Information obtained from the Valor Salesforce platform to interfere with Valor's business relationships, including on at least one occasion by attempting to divert the Bandera Job away from Valor, thereby undermining Valor's competitive position.

241.    Defendants acted with a conscious desire to interfere with Valor's business relationships by capitalizing on Valor's Salesforce platform information to which they were not entitled, in an attempt to divert the Referral Source away from Valor and to TruCare.

Alternatively, Defendants knew that such interference was certain or substantially certain to occur as a result of Defendants' conduct.

242. Defendants' interference with Valor's business relationships was willful, intentional, and without justification or privilege. Andrew Vick, TruCare, Colton Vick, and Garrett Vick had no reasonable explanation for possessing details regarding the Bandera Job, given that none were employed by Valor, had authorized access to Valor's Salesforce platform, or were contacted by Valor regarding the Bandera Job. Accessing the Valor Salesforce platform to obtain this information was not accidental. Andrew Vick, TruCare, Colton Vick, and Garrett Vick either purposefully acted to prevent Valor from engaging in a relationship with, at a minimum, the Referral Source, or knew that their scheme would certainly—or with substantial certainty—result in preventing Valor from engaging in a relationship with the Referral Source. Hegert, as a then-employee of Valor, broke down when confronted with TruCare's involvement in the Bandera Job, evidencing that he knew that his conduct lacked business justification and was certain to interfere with Valor's business relationships, in violation of his statutory and common law duties to Valor.

243. As a direct and proximate result, Valor has suffered actual harm and damages, including but not limited to lost profits, loss of business opportunities, loss of competitive advantage, and other economic harm, including risk of damage to Valor's business relationship with the Referral Source. Defendants remain in possession of Valor's trade secrets and Confidential Information, including Andrew Vick's Valor-issued laptop, and can knowingly use it to prevent additional business relationships from forming with Valor, or know that their use is substantially certain to prevent Valor from entering into a business relationship with other third parties, unless enjoined.

244. Defendants' conduct was willful, malicious, and undertaken with conscious indifference to Valor's rights, entitling Valor to an award of exemplary damages.

## COUNT X
### TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT
**(Against TruCare, Andrew Vick, Garrett Vick, Colton Vick)**

245. Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

246. Valor is a party to the Confidentiality Agreement, a valid and enforceable agreement with both Andrew Vick and Hegert.

247. Valor is a party to the Restrictive Covenant Agreement, a valid and enforceable agreement with both Andrew Vick and Hegert.

248. Upon information and belief, TruCare, Andrew Vick, Hegert, Colton Vick, and Garrett Vick were aware of the Confidentiality Agreement prior to the breaches thereof.

249. Upon information and belief, TruCare, Andrew Vick, Hegert, Colton Vick, and Garrett Vick were aware of the Restrictive Covenant Agreement from times preceding the breaches thereof.

250. Upon information and belief, Andrew Vick, as a former Director of Field Operations of Valor—the same position that Hegert also held— was not only subject to his own Confidentiality Agreement and Restrictive Covenant Agreement with Valor but was also aware of the Confidentiality Agreement and Restrictive Covenant Agreement that Hegert maintained with Valor.

251. Upon information and belief, Andrew Vick induced Hegert to breach his Confidentiality Agreement and Restrictive Covenant Agreement with Valor by persuading Hegert to provide Andrew Vick access to Valor's Salesforce CRM platform using Hegert's personal credentials, which Hegert knew Andrew Vick would otherwise be unable to access.

252. Upon information and belief, TruCare encouraged, at a minimum, Andrew Vick's breaches of the Confidentiality Agreement and Restrictive Covenant Agreement, and intentionally, willfully, and tortiously interfered with those contracts with malicious intent, through improper means, and for an improper purpose. Specifically, TruCare used Confidential Information from Valor's Salesforce platform—including, for example, the information regarding the Bandera Job—to the benefit of TruCare, knowing that TruCare was not entitled to such access or information from Valor and that the receipt of this information was obtained through violations of Andrew Vick's contracts with Valor.

253. Upon information and belief, Colton and Garrett Vick—as agents of TruCare—and TruCare previously employed or currently employ Andrew Vick as an employee or worker for TruCare. At a minimum, Colton and Garrett Vick—as agents of TruCare—and TruCare engaged Andrew Vick to provide services for TruCare on February 12-13, 2026, when he held himself out as a representative of, and signed a contract on behalf of, TruCare. Employing or engaging Andrew Vick for services for TruCare—a direct competitor of Valor—constitutes knowing interference with Valor's Restrictive Covenant Agreement with Andrew Vick.

254. The tortious conduct of TruCare, Andrew Vick, Garrett Vick, and Colton Vick—including with respect to the access and use of information regarding the Bandera Job, and the employment or engagement for services of Andrew Vick in violation of his Restrictive Covenant Agreement—has caused and will continue to cause Valor imminent and irreparable harm in the form of lost goodwill, diminished competitive advantage, loss of market share, and lost existing and potential business opportunities unless restrained and enjoined by this Court.

## COUNT XI
### CIVIL CONSPIRACY
**(Against All Defendants)**

255. Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

256. Defendants knowingly and willfully conspired and agreed among themselves to misappropriate Valor's Confidential Information and trade secrets for the financial benefit of TruCare by (a) forming Lone Star, a predecessor entity to TruCare, during Andrew Vick's employment with Valor; (b) obtaining access to Valor's Salesforce platform and information contained therein to learn about and divert Valor jobs from Valor to TruCare, upon information and belief both before and after Andrew Vick's employment with Valor ended; (c) acquiring Hegert's Salesforce platform login credentials to access Valor's platform and Confidential Information; and (d) employing or engaging Andrew Vick in violation of his Restrictive Covenant Agreement. This scheme unlawfully utilized current and former Valor employees to learn of new business opportunities and divert those business opportunities to TruCare, for the benefit of TruCare and the Vick brothers.

257. Defendants engaged in an intentional and meticulous scheme to benefit a new competing business entity, TruCare. Defendants TruCare, Andrew Vick, Garrett Vick, and Colton Vick first utilized Andrew Vick during his employment with Valor, exploiting the information and access to information he maintained in the normal scope of his duties at Valor regarding potential customers and jobs in Texas. After Andrew Vick's employment with Valor ended, TruCare, Andrew Vick, Garrett Vick, and Colton Vick pivoted their business development plans to acquiring Hegert's Salesforce credentials to access Valor's Confidential Information, rather than competing lawfully and properly in the industry. Moreover, this intentional and deliberate conspiracy targeted Valor's customers—vulnerable individuals dealing with the tragic loss of

loved ones or other traumatic scenes on their properties.  This conspiracy cannot be permitted to go on.

258.    As a result of Defendants' wrongful acts—for which they are jointly and severally liable to Valor—Valor has suffered damages and will continue to suffer damages in the form of lost goodwill, diminished competitive advantage, loss of market share, and lost existing and potential business opportunities.  Valor experienced a decline in Texas business during Andrew Vick's employment with Valor, including significant no-insurance job losses in Texas.  This harm continues unabated, as TruCare, upon information and belief, continues to employ or engage Andrew Vick for services in violation of his Restrictive Covenant Agreement, and Andrew Vick maintains his Valor-issued laptop—and proprietary documents and Confidential Information contained therein—which can be further used to damage Valor and benefit TruCare and Andrew, Colton, and Garrett Vick.  This ongoing harm to Valor must be enjoined.

259.    But for Valor's discovery of the discrepancies with the Bandera Job, Defendants TruCare, Andrew Vick, and Garrett and Colton Vick, as managers and members of TruCare, would have prevailed in diverting this specific business opportunity away from Valor to TruCare.  The full extent of Defendants' conspiracy is still unknown to Valor and will be revealed through discovery.

260.    In addition to seeking damages, Valor also seeks injunctive relief to halt future harm to Valor from Defendants' continued unlawful conduct.

## COUNT XII
## UNJUST ENRICHMENT
### (Against TruCare, Andrew Vick, Colton Vick, Garrett Vick)

261.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

262.    TruCare placed Andrew Vick in a position in which he could use—and has used—knowledge of Valor's sensitive, confidential, and proprietary information for TruCare's benefit. Additionally, TruCare, through its manager and managing member Colton Vick and Garrett Vick, respectively, improperly obtained information that TruCare knew contained Valor's sensitive, confidential, and proprietary information. In doing so, TruCare seeks to capture Valor's market share by capitalizing on Valor's Confidential Information that Andrew Vick and TruCare improperly obtained.

263.    But for Valor's discovery of the discrepancies with the Bandera Job, Defendants TruCare, Andrew Vick, and Colton and Garrett Vick, as the manager and managing member of TruCare, respectively, would have continued being unjustly enriched through their scheme.

264.    The full extent of Defendants' scheme—and the benefits already received by Defendants TruCare, Andrew Vick, and Colton and Garrett Vick, as the manager and managing member of TruCare, through these actions—is unknown to Valor and will be revealed through discovery.

265.    TruCare—and by association as its manager and managing member, Colton and Garrett Vick—would be unjustly enriched if permitted to retain the benefits received through their malicious and tortious conduct by taking undue advantage of Valor and its Confidential Information.

266.    In addition to seeking damages, Valor seeks injunctive relief to: require TruCare, Andrew Vick, Garrett Vick, and Colton Vick to delete any of Valor's Confidential Information in

their possession; require the return of Andrew Vick's Valor-issued laptop which he has failed to return; and prohibit Andrew Vick from continuing his employment with TruCare—a competing entity to Valor—until his Restrictive Covenant Agreement expires.

<u>**COUNT XIII**</u>
**CONVERSION**
**(Against Andrew Vick, TruCare)**

267.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

268.    Despite his termination, upon information and belief, Andrew Vick maintains possession of his Valor-issued laptop and an unknown number of proprietary documents containing Confidential Information.

269.    Valor is the legal owner and possessor of property that, upon information and belief, is currently in Andrew Vick's possession.

270.    Upon information and belief, TruCare employs or engages Andrew Vick for services.  Upon information and belief, TruCare has access to Andrew Vick's Valor-issued laptop and/or an unknown number of Valor's proprietary documents containing Confidential Information.

271.    Valor demanded return of its property—including Andrew Vick's Valor-issued laptop and any documents containing Confidential Information—and Andrew Vick has failed to return the property.

272.    Valor is entitled to immediate possession of its property.

273.    Valor seeks injunctive relief to compel the return of its property, including but not limited to Andrew Vick's Valor-issued laptop and any Confidential Information maintained by Andrew Vick or TruCare.  Valor further demands injunctive relief to prohibit TruCare and Andrew Vick from further accessing any Valor Confidential Information with this property, even after the

return of Andrew Vick's Valor-issued laptop, and to subject Defendants to a forensic review process of their electronically stored information to identify and permanently delete any of Valor's Confidential Information and trade secrets from any personal or company sources.  Valor also seeks damages for the losses and expenses resulting from Andrew Vick and TruCare's conversion of its property.

## COUNT XIV
### FRAUD
### (Against Andrew Vick and TruCare)

274.    Valor incorporates by reference all preceding paragraphs as though fully set forth herein.

275.    Upon information and belief, Representatives of TruCare made material misrepresentations to Valor's customers, or prospective customers, by representing themselves as Valor employees or by failing to correct an incorrect assumption that the caller or technician were employees of Valor, upon which Valor's customers relied to their detriment.  Specifically, Defendants represented themselves to the Referral Source and, upon information and belief, to other customers and prospective customers, as Valor technicians to solicit business for TruCare under false pretenses.

276.    These representations were false.  Neither Andrew Vick, after his termination on January 5, 2026, nor TruCare was authorized to dispatch technicians on behalf of Valor or represent TruCare technicians as Valor employees.

277.    At the time of the Bandera Job, Andrew Vick and TruCare knew the representations made to the Referral Source were false or were made recklessly without regard for their truth or falsity.

278.    Upon information and belief, Andrew Vick, or TruCare, or agents of TruCare, made these representations with the intent to induce, at a minimum—with further violations to be

revealed through discovery—the Referral Source to sign a contract with TruCare when the Referral Source had contacted Valor for such services.  The Referral Source—and, upon information and belief, other customers and prospective customers—justifiably relied on these false representations.

279.    As a direct and proximate result, Valor has suffered damages including loss of competitive advantage, goodwill, and profits.  Defendants' knowing and malicious conduct entitles Valor to exemplary damages.

280.    Andrew Vick and TruCare's fraudulent conduct was committed knowingly, intentionally, and with actual malice towards Valor and Valor's grieving customers, entitling Valor to an award of exemplary damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Valor respectfully prays for the following relief:

A.    A temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining: (a) Andrew Vick and Hegert from violating the terms of their Confidentiality Agreement and Restrictive Covenant Agreements; (b) TruCare, and anyone acting in concert with it, from interfering with Andrew Vick and Hegert's Confidentiality Agreement and Restrictive Covenant Agreements with Valor; (c) Defendants, any anyone acting in concert with Defendants, from utilizing, divulging, disclosing, or misusing any Valor Confidential Information and trade secrets; (d) Defendants from accessing or attempting to access Valor's Salesforce platform or any other Valor computer systems or databases; (e) Defendants from impersonating Valor or its employees or misrepresenting any affiliation with Valor; and (f) Andrew Vick from performing any work for TruCare until the expiration of his Restrictive Covenant Agreement and after all Valor confidential, proprietary, and trade secret information has been returned to Valor

and removed from Defendants' possession;

B.      An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Andrew Vick and any employee or representative of Valor;

C.      An Order requiring Defendants to submit to a forensic review of their electronically stored information for the purpose of identifying and permanently deleting any of Valor's Confidential Information and trade secrets.  Such forensic review shall include examination of (i) all personal electronic devices, including without limitation cellular telephones, tablets, laptops, and desktop computers; (ii) any USB drives or other portable storage media used by Andrew Vick to transfer files from his Valor-issued laptop; (iii) all email accounts, whether personal or professional; and (iv) all cloud storage accounts, including but not limited to services such as Dropbox, Google Drive, iCloud, and OneDrive;

D.      An Order requiring Defendants to return any of Valor's Confidential Information, documents, and property currently in their possession, including Andrew Vick's Valor-issued laptop;

E.      Upon final trial, judgment against Defendants for full permanent injunctive relief in accord with Paragraph A above and for the full amount of Valor's damages, including, but not limited to, lost profits as found by the trier of fact as a consequence of their conduct;

F.      Exemplary damages against Defendants for their willful, intentional, malicious, and/or recklessly tortious conduct in an amount consistent with constitutional and statutory principles, pursuant to Tex. Civ. Prac. & Rem. Code § 41.001(5), Tex. Civ. Prac. & Rem. Code

§ 41.003, Tex. Civ. Prac. & Rem. Code § 134A.004, and 18 U.S.C. § 1836(b)(3)(D), and any other applicable provision at law or equity;

G.     Pre-judgment interest at the maximum lawful rate;

H.     Post-judgment interest at the maximum lawful rate;

I.     Valor's reasonable and necessary attorney's fees in prosecuting its claim(s) through trial and, if necessary, through appeal, pursuant to Tex. Civ. Prac. Rem. & Code § 38.001(b)(8), Tex. Civ. Prac. Rem. & Code § 134A.005, Tex. Civ. Prac. Rem. & Code § 143.002, and 18 U.S.C. § 1836(b)(3)(D), as well as under any other applicable provision at law or equity;

J.     All costs of suit; and

K.     Any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Valor hereby demands a trial by jury trial on all issues so triable.


Dated: March 5, 2026                                    JONES DAY


By: */s/ Brian Jorgensen*
_____
    Brian M. Jorgensen, Bar No. 24012930
    bmjorgensen@jonesday.com
    Enrique A. Lemus, Bar No. 24092684
    elemus@jonesday.com
    JONES DAY
    2727 North Harwood Street
    Dallas, TX  75201.1515
    Telephone: +1.214.220.3939
    Facsimile:  +1.214.969.5100

    *Attorneys for Plaintiff Valor Technical
    Cleaning, LLC*