# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **VALOR TECHNICAL CLEANING, LLC,** | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | NO. |
| | § | |
| **ANDREW VICK, TRUCARE BIOCLEAN** | § | |
| **LLC, COLTON VICK, GARRETT VICK,** | § | |
| **AND BRIAN HEGERT.** | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF BENJAMIN PITTS**

I, Benjamin "Ben" Pitts, declare and state as follows:

1.      I am the Chief Executive Officer ("CEO") of Valor Technical Cleaning, LLC ("Valor" or the "Company"), over the age of 18, and a resident of Colorado.  I have personal knowledge of the following facts and could testify competently to them if called to do so.  The facts set forth herein are personally known to me and, unless otherwise noted, are based on my own firsthand knowledge and/or observation.  I make this Declaration in support of Valor's Complaint  (ECF No. 1).

2.      As CEO of Valor, I oversee the operations of the entire Company.  This includes, among other responsibilities, implementing strategies designed to grow the Company's business, supervising leadership and employees, and monitoring Company performance.

**Valor's Business and Its Valuable Trade Secrets and Confidential Information**

3.      Valor is a professional crime scene and biohazard cleanup service that provides its cleanup services nationwide.  Valor employs Amdecon-certified, OSHA-compliant technicians that operate with military precision, delivering compassionate service with unmatched attention to safety and detail.

4.      Valor's business depends on a sophisticated and carefully cultivated referral network.  Over many years, and at significant expense, Valor has developed relationships with funeral homes, victim advocates, and other professionals across the country who refer families and individuals to Valor when crime scene and biohazard cleanup services are necessary.  This referral network represents one of Valor's most valuable competitive assets.

5.      Valor's customers are often facing the aftermath of violent deaths, suicides, traumatic accidents, and crime scenes.  These vulnerable individuals place their trust in Valor to provide technical expertise and compassionate service.  These customers call Valor from all over the country, and request that Valor perform services across the lower 48 states.

6.      When a customer contacts Valor needing crime scene and biohazard cleanup services, the call is tracked through CallRail, a confidential call tracking and analytics platform that tracks incoming call data for Valor representatives, who then learn about the needed services. The Valor representative logs the customer's address and any other applicable information in the Valor customer relationship management ("CRM") system, Salesforce.  CallRail is integrated with Valor's Salesforce platform, which seamlessly allows Valor to combine call data and customer information to track new leads.  After assessing the lead and reviewing the available and nearby cleanup technicians, Valor dispatches a technician to the customer's location.

7.      If an individual or entity contacts Valor regarding its services, is a candidate for Valor's services, and establishes an appointment for services, Valor considers this individual or entity a prospective customer and prepares accordingly, including by sending a technician to the location, preparing and executing a letter of engagement, and otherwise taking steps to formalize the customer relationship.

8.    Valor maintains technicians throughout the country and provides crime scene and biohazard cleaning services across the lower 48 states, including in Texas.  Because technicians are not located in every city, Valor will, if necessary, send technicians on travel assignments to complete jobs if there is not a nearby available technician.

9.    Before beginning services and after reviewing the site, Valor requests that the customer sign an engagement letter, covering the terms of the services.

10.    Valor's services are often covered by the customer's insurance.  Sometimes, upon learning that the insurance policy does not cover the Valor cleanup services, or deciding not to use their homeowners insurance policy for the cleanup services, a prospective customer may cancel the job, as the cost of services is too high without insurance—upwards of thousands of dollars out-of-pocket.  Even if a prospective customer cancels their intended job due to insurance purposes, Valor still considers this a prospective customer and business relationship to monitor in Salesforce, because the situation could later change, including upon further discussions with insurance, or the prospective customer's decision to pay for the services out-of-pocket.  Valor's Salesforce platform tracks a customer or prospective customer's complete history with Valor, including whether jobs are canceled by customers, disqualified for insurance purposes, or lost for other reasons.

11.    Valor relies on its employees—including its Directors of Field Operations—to accurately report lost jobs in Salesforce, including the reason for that loss.  An employee willing to subvert this reporting requirement could, however, theoretically falsely report a lead or job as "lost" due to no insurance—which could be a lack of insurance coverage or that a customer refused to use their homeowners insurance policy—while secretly directing a competing company to that customer to complete the work—all without drawing scrutiny from Valor management.

-3-

**<u>Valor's Measures to Protect Its Trade Secrets and Confidential Information</u>**

12.     Valor has implemented extensive measures to safeguard and secure its trade secrets, and confidential and proprietary information.  These measures reflect the substantial independent economic value Valor derives from maintaining the confidentiality of its business information.  A competitor with access to Valor's referral network could contact Valor's sales leads, customers, or prospective customers, and benefit off of Valor's efforts to develop these leads.

13.     Valor utilizes CallRail and Salesforce to track inbound calls from individuals and entities throughout the United States, referrals from referral sources, jobs, and customer data of customers and prospective customers throughout the country.  Valor licenses its Salesforce platform from Salesforce and has the ability to use, control, and restrict access to its license of Salesforce.  Access to Valor's Salesforce platform is restricted to authorized users who are issued unique login credentials.  The platform is password-protected and requires multi-factor authentication, meaning that only authorized users can access Salesforce and the data contained therein.

14.     Valor employees, including Andrew Vick and Brian Hegert ("Hegert") during their respective employments with Valor, access Salesforce using several layers of authentication, including a username, password, and multi-factor authentication.  Multi-factor authentication requires the user to confirm their identity through a second verification method—such as an authentication app—before access is granted, ensuring that only the authorized employee can log in.  Valor employees across the country utilize their respective login credentials to access Valor's Salesforce platform and to communicate with customers or prospective customers across the country.  Valor employees are not permitted to send, share, or distribute their respective Salesforce login credentials with anyone else inside or outside the Company.  Valor employees are permitted to use the Valor Salesforce platform only for Valor-related business purposes.  Valor employees

are not permitted to send, share, distribute, or otherwise disseminate, information contained in Valor's Salesforce platform to third parties, including former employees. After an employee is terminated, their Salesforce account is deactivated, and the former employee loses login credentials to access the Valor Salesforce platform.

15.     Valor's Employee Handbook requires the return of all Company property prior to or at the time of an employee's separation to ensure that Valor's property, confidential information, and trade secrets are protected following a separation. Valor property includes but is not limited to: (a) cell phones, iPhones, tablets, or other Valor-issued handheld devices; (b) laptops, desktop computers, files, computer files, disks, or data; and (c) access badges. Valor employees are permitted to use Valor-issued devices only for Valor-related business purposes. Employees sign a handbook acknowledgement at or near the start of their employment with Valor, acknowledging that they have read the Employee Handbook and agree that it is their responsibility to "comply with the policies contained in" it.

16.     Valor's Employee Handbook covers the Company's confidentiality expectations. The Employee Handbook provides:

> Our company has an excellent reputation for conducting its business activities with honesty, fairness, and in accordance with the highest ethical standards. As an employee, you enjoy the benefits of that reputation and are obligated to uphold it.
>
> Information is an asset of the Company and, as such, steps will be taken to protect it from unauthorized access, modification, reproduction, destruction or disclosure (written, verbal or electronic transmittal), whether accidental or intentional. This includes, but is not limited to, any information processed by hand, personal computer, laptop or other electronic devices utilized in the Company's operations, and maintained in hard copy files, storage or electronic devices and services.
>
> Protecting our company's and customer information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not

discuss the Company's confidential business or information or any customer information with any unauthorized persons or any person outside of the Company and make every effort to keep such information secure and confidential.

As trusted employees of our company, you acknowledge that customer and client lists, customer information, documents, business data, and proprietary information are valuable assets of our Company. You agree that you will not, at any time, for any reason, disclose or use any of our confidential information, trade secrets, customer lists, customer information, etc. unless specifically authorized to do so, and you further agree not to discuss or disclose such information to anyone outside of our Company. Violations of this policy will result in severe disciplinary action and/or legal action. This confidentiality requirement applies to all current employees as well as to all employees for a two (2) year period following the termination of their employment. In the case of trade secrets, former employees may not misappropriate, use, or divulge the trade secrets indefinitely following their termination of employment.

17.     The Employee Handbook provides that employees may not "at any time, for any reason, disclose or use any of our confidential information, trade secrets, customer lists, customer information, etc. unless specifically authorized to do so, and you further agree not to discuss or disclose such information to anyone outside of our Company."

18.     Valor also requires its employees to sign a Confidentiality Agreement at the outset of their employment. It is contained in each employee's offer letter. By signing this agreement, each employee agrees to hold any and all Valor confidential information and trade secrets in trust and confidence for Valor's sole and exclusive use and benefit.

19.     Given the requirement that Valor employees sign the Confidentiality Agreement and Employee Handbook upon hire, Valor employees are onboarded with the understanding that the information contained in Salesforce is confidential.

20.     On May 7, 2025, Andrew Vick signed his Confidentiality Agreement. Among other things, agreeing to the terms of the Confidentiality Agreement was a condition of Andrew

Vick's employment. Valor also provided Andrew Vick with confidential and proprietary information during his employment with Valor in exchange for his acceptance of the terms of the Confidentiality Agreement.

21. On September 17, 2025, Hegert signed his Confidentiality Agreement. Among other things, agreeing to the terms of the Confidentiality Agreement was a condition of Hegert's employment. Valor also provided Hegert with confidential and proprietary information in exchange for his acceptance of the terms of the Confidentiality Agreement.

22. The Confidentiality Agreement required Andrew Vick and Hegert to hold Valor confidential and proprietary information in "trust and confidence for Valor's sole and exclusive use and benefit." The Confidentiality Agreement requires employees to agree as follows:

> In the course of your employment with Valor, you will come into possession of confidential and proprietary information regarding Valor's business activities. You acknowledge that all such information belongs to Valor, constitutes specialized and highly confidential information not generally known in the industry; and in some instances, constitutes trade secrets of Valor. Accordingly, you recognize and acknowledge that it is essential to Valor to protect Valor's confidential and proprietary information, and you will hold such information in trust and confidence for Valor's sole and exclusive use and benefit.

23. Valor has different agreements to protect its Confidential Information[1]. The Confidentiality Agreement broadly defines the information defined as confidential and includes Valor's business activities generally. Valor's restrictive covenant agreements defines Confidential Information to include:

> (i) information concerning the business or affairs of the Related Companies, however documented, whether or not such information is considered a "trade secret" under either common law or any applicable statute, including, but not limited to, historical financial

---

[1] "Confidential Information" as used in this Declaration refers collectively to information falling within the definitions used in the Confidentiality Agreement and restrictive covenant agreements.

statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training techniques and materials, product or service specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing, marketing or distribution methods and processes, customer lists, prospective customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures and architectures (and related formulae, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a "trade secret" either under common law or as such term is defined by statute under the laws of any applicable jurisdiction; and (ii) notes, analysis, compilations, studies, summaries and other materials prepared by or for any Related Companies, containing or based, in whole or in part, on any information included in the foregoing. Notwithstanding the foregoing, "Confidential Information" will not include any of the foregoing that (x) is or becomes generally available to the public other than as a result of your breach of this Restrictive Covenants Addendum, or (y) is or becomes available to you on a non-confidential basis from a source, other than the Related Companies, that, to your knowledge, after reasonable inquiry, was not at the time of disclosure under a confidentiality obligation with respect to such information. You acknowledge and agree that the Confidential Information is treated by the Related Companies as confidential and derives independent value from not being generally known to and not readily ascertainable by proper means by other persons.

24.    Both Andrew Vick and Hegert agreed to non-compete agreements as a part of Valor's incentive bonus program, the Equity Appreciation Plan. To participate in that program, Andrew Vick and Hegert each agreed to the Restrictive Covenants Addendum ("Restrictive Covenant Agreement") to the Participant's Award Agreement, prohibiting each from working for certain competitors or soliciting certain clients and employees during and after his employment with Valor. The Restrictive Covenant Agreement states that Andrew Vick and Hegert would have

or will have access to trade secrets and Confidential Information of Valor, "which, if disclosed, would unfairly and inappropriately assist in competition against" Valor.

25.    The Restrictive Covenant Agreement provides that Andrew Vick and Hegert each:

> shall not, directly or indirectly, during the Restricted Period and within the Restricted area, (i) solicit, divert or take away business from, or compete with, any Related Company; (ii) own, operate, control, finance, manage, advise, be employed or engaged by, or perform any services for, invest in or otherwise become associated in any capacity with (other than holding less than two percent (2%) of the outstanding equity or debt securities of such person having securities that are listed for trading on a national securities exchange or quotation system or actively traded over the counter), any business, company, partnership, organization, proprietorship or other entity that is engaged in the same or similar business as the business conducted by the Related Companies; or (iii) engage in any practice, for the purpose or effect of which is to intentionally evade the provisions of this covenant.

26.    The Restrictive Covenant Agreement defines "Restricted Area" as "an area within a 150-mile radius of the location where you perform services for the Company and within 150-mile radius of any location of a customer or client of any Related Company for whom you provide services." Although the geographic composition of the Regions has changed over time, during his tenure with Valor, Andrew Vick managed Texas, whether Texas was assigned the South or Central Region. Andrew Vick performed services for Valor customers within 150 miles of Kerrville, Texas.

27.    "Restricted Period" is defined in the agreement as "the period of time during your employment or service with any Related Company, plus a period of two (2) years following any termination of such employment or service." According to these terms, the Restrictive Covenant Agreement prohibits Andrew Vick and Hegert from engaging in the above-identified behaviors—including working, being employed by, or performing services for a competing entity—during

their employment with Valor and for two years following their termination within the Restricted Area.

28.    The Restrictive Covenant Agreement also prohibits an employee from conduct to "induce or attempt to induce any . . . customer. . . to terminate or adversely change its relationship with such Related Company . . . ."

29.    The Restrictive Covenant Agreement states that "[i]n the course of your employment by a competitor, you would inevitably use or disclose such trade secrets and Confidential Information," which the employee obtains through their employment relationship with Valor.

30.    The Restrictive Covenant Agreement permits Valor to seek specific performance and/or injunctive relief, without posting a bond or other security, in the event of a breach or threatened breach of the agreement because "money damages would be an inadequate remedy for any breach."

31.    Valor's Confidential Information and trade secrets are some of Valor's most valuable assets.  Valor has spent many years and millions of dollars to generate customer contacts and referral sources.  Valor has used—and will continue to use—its Confidential Information in the crime scene and biohazard cleanup service industry.  Because this information is confidential, Valor's competitors do not know and do not have access to such information, which provides Valor with a competitive advantage.

**B.    Andrew Vick and Hegert's Employment with Valor and Access to Confidential Information**

32.    Valor hired Andrew Vick as a Director of Field Operations on or about May 22, 2025.  Valor hired Hegert as a Director of Field Operations on or around September 22, 2025.

-10-

33.     In their roles as Directors of Field Operations for Valor, Andrew Vick and Hegert managed the Valor Emergency Call Center, received inbound calls, dispatched technicians to jobs, and followed up with clients.  As Directors of Field Operations, Andrew Vick and Hegert were highly trusted employees.   In their roles, Andrew Vick and Hegert had access to Valor's Confidential Information including, among other things, the CallRail platform and the Salesforce platform containing sales leads, client contact information, specialized training in highly technical and specific biohazard situations, product or service specifications, customer lists, prospective customer lists, current and anticipated customer job specifications, price lists, and business plans.

**C.      Formation of Competitor, TruCare, During Andrew Vick's Employment with Valor**

34.     While Andrew Vick was employed by Valor and bound by his confidentiality and restrictive covenant obligations, Colton Vick and Garrett Vick formed a competing company. Upon information and belief, Andrew Vick, Colton Vick, and Garrett Vick are brothers.

35.     According to Texas Secretary of State files that I have reviewed, a true and correct copy of which is attached to this Declaration as **Exhibit A**, on October 16, 2025, Colton Vick filed a Certificate of Formation with the Texas Secretary of State to establish Lone Star BioClean Solutions LLC ("Lone Star").  According to Garrett Vick's LinkedIn profile, Garrett Vick has been a Managing Member of TruCare since October 2025.

36.     According to the Certificate of Formation, Colton Vick was the initial registered agent for Lone Star, with an address of 2135 Green Creek St., San Antonio, TX 78232.  The Certificate of Formation listed Colton Vick as a Manager of Lone Star.

37.     According to a Certificate of Amendment filed by TruCare with the Texas Secretary of State, a true and correct copy of which is attached to this Declaration as **Exhibit B**, Lone Star rebranded and renamed the entity to TruCare BioClean LLC on or about February 3, 2026.  This occurred less than one month after Andrew Vick's termination from Valor.

-11-

38.    I have visited the TruCare website.  The TruCare website describes TruCare as "a veteran- and family-owned biohazard remediation company providing professional, discreet, and compassionate trauma scene cleanup services across Texas.  The company was founded by brothers raised in the Texas Hill Country, now living in the Dallas–Fort Worth and San Antonio area, who recognized a critical need for clear, reliable biohazard cleanup services during times of crisis."  The TruCare website provides that TruCare was founded by brothers.  A true and correct screenshot from TruCare's "Our Story" page of the website is included below:

## Our Story

TruCare BioClean is a veteran- and family-owned biohazard remediation company providing professional, discreet, and compassionate trauma scene cleanup services across Texas. The company was founded by brothers raised in the Texas Hill Country, now living in the Dallas–Fort Worth and San Antonio area, who recognized a critical need for clear, reliable biohazard cleanup services during times of crisis.

That need became especially clear while assisting first responders during the July 2025 floods that impacted communities across Texas and resulted in significant loss of life. In those moments, families and property owners were often unsure who to call or what steps to take next once emergency response concluded. TruCare BioClean was created to fill that gap—providing guidance, rapid response, and professional cleanup when it matters most.

Our role is to help restore safety, dignity, and peace of mind after traumatic events. We approach every situation with respect, professionalism, and a commitment to doing the work the right way for the communities we serve.

39.    The TruCare website lists the company's address as 819 Water St., Ste. 107, Kerrville, TX 78028, with a contact number of 830-282-0809.

**D.    <u>Suspicious Decline in Valor's Texas Business During Andrew Vick's Employment</u>**

40.    Beginning in the summer of 2025—shortly after Andrew Vick joined Valor and while TruCare's predecessor Lone Star was being organized—Valor experienced an increased number of no-insurance lost jobs, particularly in the South and Central Regions.  These losses

occurred when inbound referrals were not converted to successful jobs due to an alleged lack of insurance or a family's alleged refusal to use their homeowner's insurance policy. Although the geographic composition of the Regions has changed over time, Andrew Vick managed Texas throughout his employment, whether Texas was assigned the South or Central Region. Upon information and belief, this pattern resulted in substantial lost business for Valor.

41.     While there was a general decline of inbound referrals across the Company during this period, there was a noticeable percentage of lost jobs due to an alleged lack of insurance specifically by Andrew Vick. The Company reviewed Salesforce CRM data for this period, and that data revealed that Andrew Vick's percentage of lost jobs due to an alleged lack of insurance— as logged in Salesforce—was higher than expected based on the number of jobs from July 2025 through his termination in January 2026. Andrew Vick's no-insurance percentage rate for this period was approximately double the Company average.

42.     Given Andrew Vick's significant percentage of no-insurance lost jobs, upon information and belief, Andrew Vick may have been improperly funneling opportunities for jobs to TruCare—formerly known as Lone Star—as early as July 2025. Valor is investigating these allegations further.

**Andrew Vick's Termination and Post-Termination Misconduct**

43.     On January 5, 2026, Valor terminated Andrew Vick's employment. With his termination, Andrew Vick lost access to Valor's Salesforce platform and information contained in Valor's Salesforce platform was no longer available to him using his own username and password.

44.     Following his termination, Andrew Vick retained his Valor-issued laptop in violation of his contractual obligations and despite Valor's request to return the laptop. Valor does not know the extent of Confidential Information which may exist on Andrew Vick's Valor-issued laptop. Although access to Valor's systems has been blocked on Andrew Vick's Valor-issued

laptop after his termination, it is possible that Andrew Vick could have downloaded any number of proprietary documents or Confidential Information prior to his termination.  The retention of the Valor-issued laptop—and Valor Confidential Information on that laptop—poses an ongoing and serious threat to Valor, as Andrew Vick could continue to access and use any proprietary documents or Confidential Information on the device.

45.     Valor maintains a corporate account with National Car Rental ("National") which provides discounts to rentals for current employees.  The Valor corporate National account also has a Valor corporate card linked to the account, although employees can also use their personal credit card to pay charges.

46.     Following his termination, from January 9, 2026 to January 11, 2026, Andrew Vick rented a Mercedes GLE 350 with National at the Dallas-Fort Worth International Airport in Dallas, Texas, using the Valor corporate National account.  At the time of his rental with National on January 9, 2026, Andrew Vick was no longer employed by Valor and had no authorization to use Valor's corporate National account.

**The February 12, 2026 Bandera, Texas Job (the "Bandera Job")**

47.     Valor's Salesforce data shows that at approximately 2:34 PM CT on February 12, 2026, a Valor employee logged information relating to the Bandera Job onto the Salesforce platform.  This information included the identity of the caller along with the location and nature of the work requested.  Hegert and two other Valor employees were tagged on the Bandera Job in Salesforce after it was logged.

48.     I learned additional details regarding the events of February 12-13, 2026 from the woman who called in the Bandera Job to Valor (the "Referral Source").  The Referral Source shared that on or about February 12, 2026 at 2:38 PM CT, Valor technician Antwone Ortiz

("Ortiz") contacted the Referral Source to let her know that he was around an hour and half away from the Bandera Job property.

49.    At 2:53 p.m. CT on February 12, 2026, Valor's Salesforce data shows that someone logged in to Valor's Salesforce platform from an IP address registered to a local internet service provider serving the Kerrville, Texas area, using Hegert's Salesforce login credentials. This person is believed to be Andrew Vick. Salesforce data shows that the latitude and longitude of the individual logging in were 30.04500 and -99.1417, which according to a search on Google Maps is just 0.1 miles from TruCare's headquarters in Kerrville, Texas. The geographic correlation between the unauthorized login and TruCare's headquarters cannot be a coincidence.

50.    On this day, I understand that Hegert was working in the Valor office located in Centennial, Colorado, so he could not have logged onto Salesforce from a device located in Kerrville, Texas. Upon information and belief, at 2:53 p.m. CT on February 12, 2026, Andrew Vick utilized Hegert's Salesforce login credentials to access Valor's Salesforce platform from his iPhone in Kerrville, Texas.

51.    Valor did not grant Andrew Vick permission to utilize Hegert's Salesforce credentials on February 12, 2026, or on any other date.

52.    I learned from the Referral Source that on February 12, 2026, she received a call from 726-215-7873 at approximately 4:30 PM CT. According to the Referral Source, the caller told her that the assigned Valor Technician—Ortiz—was diverted to another job at a murder scene. The Referral Source stated she had no reason to believe this call was not from Valor—as Valor was the only company she contacted for bioremediation services.

53.    A simple Google search reveals that 726-215-7873 is the number that Google associates with TruCare, as evidenced by the screenshot below:



### TruCare BioClean of San Antonio

5.0 ★★★★★ 7 Google reviews

Crime victim service in San Antonio, Texas

**Address:** 711 Navarro St ste 230, San Antonio, TX 78205

**Phone:** (726) 215-7873

**Hours:** Open 24 hours ▾

Suggest an edit · Own this business?

54.    Upon information and belief, Defendants coordinated the February 12, 2026 call from 726-215-7873 claiming that Valor technician Ortiz had been diverted to another call and that a new technician would be sent to the Referral Source's job.

55.    After the phone call informing her that Ortiz had been diverted from the Bandera Job, the Referral Source told me she received a second call at approximately 4:33 PM CT on February 12, 2026.  The call was from a man identifying himself as "Arturo Cruz," with a phone number of 630-697-2638.  "Arturo Cruz" told the Referral Source that he was the technician now assigned to the Bandera Job and that he would be at the property shortly.

56.    I am aware that on February 12, 2026, Ortiz received a phone call from 210-382-3748, asking to reschedule Valor's services for the Bandera Job on behalf of the Referral Source. A public records search shows that this number, 210-382-3748, belongs to a Verizon Wireless account for a Genevieve Narvaiz in San Antonio, Texas.  Upon information and belief, Defendants

-16-

coordinated the February 12, 2026 call from this woman to Ortiz, claiming to be connected to the Referral Source and canceling the Valor services.

57.    The Referral Source told me that after she received the call from "Arturo Cruz," a technician arrived at the Bandera Job property approximately ten minutes later.  The Referral Source shared that the technician arrived in a silver GMC pickup truck with no identifying logos. The technician wore gray khaki pants and a shirt, with no logos on the shirt.  The Referral Source told me that the technician began taking photos of the scene upon arrival.  The technician told the Referral Source that he would be removing the biohazardous material from her home in his truck, but that he needed to purchase trash bags from Home Depot before doing so.

58.    I learned from the Referral Source that she was then sent a contract for signature through DocuSign.  Distraught over her family member's death, the Referral Source did not pay close attention to the contract and signed it from her smart phone.  The Referral Source shared that because she had only called Valor about the Bandera Job, and had a history of referring jobs to Valor, she had no reason to believe that a technician from another company had arrived at her property.  It was only after "Arturo Cruz" left for the day, that the Referral Source took a closer look at the contract and noticed that the company listed on the contract she signed was TruCare, not Valor.

59.    I learned from the Referral Source that when she reviewed the email she received with the completed contract, she noticed that the email was sent to her by TruCare BioClean via Docusign and with the subject line "Completed: TruCare BioClean Services Agreement – [ADDRESS REDACTED], Bandera, TX ."  A screenshot of that email, which was sent to Valor by the Referral Source, is included below, redacted for privacy purposes.





60.    I am aware that the Referral Source sent Albert Armendariz ("Armendariz") a screenshot of the contract she signed with TruCare. I have reviewed the screenshot, and it is included below. A shown below in a magnified image, the contract is counter-signed by TruCare representative "Drew Vick." The Referral Source told me that she had never heard of "Drew Vick" or "TruCare BioClean" before this incident. The screenshots are redacted for the Referral Source's privacy.

## Authorization

By signing below, Client authorizes TruCare BioClean to perform the services described above and agrees to the terms of this Agreement.

Printed Name / Title: ▮▮▮▮▮▮▮▮▮

Insurance Company: ▮▮▮▮▮

Client Signature: ▮▮▮▮▮    Date: 2/12/2026

Policy Number: ▮▮▮▮▮▮▮

TruCare BioClean Representative: Drew Vick

Signature: Drew Vick    Date: 2/12/2026



**The Bandera Job Theft is Discovered**

61.     The Referral Source informed me that she received a call from Ortiz on the morning of February 13, 2026, to ask when she would like to reschedule the cleaning of her property.  The Referral Source was confused because a technician was already cleaning her property.

62.     I learned from the Referral Source that after her call with Ortiz, the Referral Source received another call from an individual, claiming to be a TruCare representative, indicating that there was a "mix-up" about the Bandera Job.  The Referral Source was confused by this.  The Referral Source also stated that she then initiated a three-way conference call between Armendariz and the TruCare representative on February 13, 2026.  The Referral Source stated that the TruCare representative called from a number listed as 907-987-5393.  The Referral Source noted that, on the call, the TruCare representative was told that the TruCare technician needed to leave her property, as she only wanted Valor to clean her home.

63.     Valor maintains its employees' personal cell phone numbers in the course of their employment with Valor for communication purposes.  According to Valor records, Valor has 907-987-5393 listed as a personal cell phone number for Andrew Vick.  Upon information and belief, Andrew Vick was the caller who identified himself as "Andrew" during this February 13, 2026 phone call with the Referral Source and Armendariz.

64.     Upon information and belief, Andrew Vick is employed by TruCare because of his representations to the Referral Source and Armendariz on February 13, 2026 that he was a representative of TruCare; and his name and signature on the Referral Source's February 12, 2026 TruCare contract as the "TruCare BioClean Representative."

65.     TruCare representatives—including Andrew Vick—had no independent, innocent way to know about the Bandera Job unless TruCare had knowledge from Valor's Salesforce

-20-

platform, because the Referral Source had only called Valor about the Bandera Job. The timing of Andrew Vick's termination—on January 5, 2026—and Andrew Vick's involvement in the Bandera Job—on February 12, 2026—combined with the access to Valor information that Andrew Vick had during his employment, made this incident highly suspicious to Valor.

66.    Although Valor ultimately completed the Bandera Job for the Referral Source, Valor has suffered an injury to its business reputation due to TruCare's conduct. Since the discovery of the TruCare scheme on February 13, 2026, Valor has already spent, and will likely continue to spend, significant time and financial resources to maintain its business relations and employee morale. Valor has spent more than $5,000 on this incident, including a forensic investigation.

**Forensic Evidence of How Hegert Conspired with Andrew Vick**

67.    Upon Hegert's revelation regarding his contact with Andrew Vick, Valor conducted a forensic analysis and investigated Hegert's Salesforce login history. This investigation revealed significant forensic evidence of the conspiracy between Hegert and Andrew Vick.

68.    Investigation of logins on Hegert's Salesforce account revealed that beginning on February 9, 2026, there were several logins to Hegert's Salesforce account originating from an iPhone in Kerrville, Texas, where TruCare is located. These Kerrville logins began on February 9, 2026—a little over a month after Andrew Vick's termination from Valor.

69.    According to this Salesforce information, prior to February 9, 2026, during the preceding 60 days, all logins to Hegert's Salesforce account occurred from only two locations: Denver, Colorado, where Valor's office is located, and Colorado Springs, Colorado, where upon information and belief, Hegert resides.

70.    On February 9, 2026 at 8:38 p.m. CT, an iPhone in Kerrville, Texas, 78028 attempted to log into Hegert's Salesforce account using Hegert's Salesforce credentials from IP Address 173.224.3.146, which, based on a Google search, is an address registered to a local internet service provider serving the Kerrville, Texas area. As this was the first attempt to access Hegert's Salesforce account from this device, the sign-on triggered a multi-factor authentication request. The multi-factor authentication was successfully completed, according to Salesforce login data, such that this device gained access to Valor's Salesforce platform on February 9, 2026, at 8:39 p.m. CT. This successful completion of multi-factor authentication indicates that Hegert actively assisted the unauthorized access by providing not only his credentials but also the multi-factor authentication "verification code."

71.    Prior to February 9, 2026, during the preceding 60 days, all logins to Hegert's Salesforce account occurred from either an Internet browser or an Android device. The login on February 9, 2026 was the first iPhone login using Hegert's credentials during this period.

72.    On February 11, 2026 at 4:53 p.m. CT, an iPhone in Kerrville, Texas, from the same IP Address (173.224.3.146) logged into Valor's Salesforce platform again using Hegert's credentials. This login no longer required a multi-factor authentication, as the iPhone from this IP Address had previously logged into the system on February 9, 2026.

73.    As discussed above, on February 12, 2026 at 2:53 p.m. CT—the day of the Bandera Job theft—an iPhone in Kerrville, Texas, from the same IP Address (173.224.3.146) logged into Valor's Salesforce platform using Hegert's credentials.

74.    Salesforce data shows that the latitude and longitude for this IP Address is 30.045100, -99.1417. A Google search puts this location by the Guadalupe River in Kerrville,

Texas, which Google Maps estimates is a 0.1-mile drive from TruCare's location at 819 Water Street, Kerrville, TX 78028 listed on its website, a screenshot is included here:



75.    The Salesforce login at 2:53 p.m. CT on February 12, 2026, using Hegert's credentials, occurred approximately 19 minutes after Valor logged the inbound call from the Referral Source at 2:34 p.m. CT in Salesforce.  This timing cannot be coincidental.  It demonstrates that the unauthorized user was monitoring Valor's Salesforce system for new job opportunities to steal.  Upon information and belief, Andrew Vick utilized Hegert's Salesforce credentials on February 12, 2026 to gain access to Valor's Salesforce platform to learn about the Bandera Job.

76.    Hegert's Salesforce data also showed access using his personalized credentials on February 9-12, 2026 from another IP Address (174.255.120.9).  This access indicates that Hegert likely provided unauthorized access to additional third parties beyond Andrew Vick.

**Resulting Actions by Valor**

77.    Shortly after discovering this misconduct, Valor's counsel sent Andrew Vick and TruCare cease and desist letters on February 16, 2026, and to Hegert on February 18, 2026.  The letters demanded, among other things, that Andrew Vick, TruCare, and Hegert cease and desist from engaging in any conduct causing substantial harm to Valor's business interests, including but not limited to: (1) stealing, accessing, and using Valor's confidential and proprietary business information and trade secrets; (2) engaging in fraudulent misrepresentation in connection with TruCare; and (3) fraudulently using Valor's assets.  The cease and desist letters also demanded that Hegert cease and desist from destroying Valor property.  The letters requested that Andrew Vick, TruCare, and Hegert identify any Valor property in their respective possession; return any Valor property and destroy any copies; and preserve relevant information.

78.    On February 18, 2026, I understand that Andrew Vick responded to the Valor cease and desist letter via email, acknowledging receipt of the letter and denying possession of any Valor property.  On February 20, 2026, I understand that Deondrey Russell informed Valor that the firm of Almanza, Blackburn, Dickie & Mitchell LLP represented TruCare and promised a substantive response the following week.  As I understand it, as of March 4, 2026, Valor has yet to receive a substantive response from TruCare's counsel, despite their counsel's promise.  As I understand it, as of March 4, 2026, Valor has not received a response from Hegert.

79.    Given the lack of responses and lack of assurances that Defendants' conduct would end, I understand that Valor informed Andrew Vick, TruCare, and Hegert that it would move for a temporary restraining order.

-24-

I declare under penalty of perjury that the foregoing is true and correct.

Executed in _Centennial_   _Colorado_, on March _5_, 2026.

_____
Ben Pitts
